**In the Matter of Honorable Winston V. BUFORD, Respondent.**

No. 60603.

Supreme Court of Missouri
En Banc.

Feb. 28, 1979.
Rehearing Denied March 16, 1979.

James M. Smith, Counsel, Commission on Retirement, Removal and Discipline, St. Louis, Dee Wampler, Springfield, for Commission.

Thomas B. Curtis, Leland B. Curtis, David R. Hensley, Thomas E. Allen, Clayton, for respondent.

PER CURIAM.

This is a disciplinary proceeding brought by the Commission on Retirement, Removal and Discipline (Commission) pursuant to art. 5, sec. 27, Mo.Const., and Rule 12. Respondent is the circuit judge for the 37th judicial circuit which encompasses the counties of Howell, Shannon, Carter, and Oregon. The Commission found respondent violated the Supreme Court Rules, the Code of Judicial Conduct, and the statutes of the state of Missouri, and recommended that respondent be removed from office. This case is on review before this court pursuant to art. 5, sec. 27, Mo.Const., as amended 1970,[1] and Rule 12.

A unanimous opinion in this case was handed down on November 14, 1978, holding that respondent be suspended, without pay, for a period of thirty days. Subsequently, this court sustained the Commission's motion for rehearing. The court informed the parties it desired briefs and

1. All references are to the Missouri Constitution as amended 1970 unless otherwise noted.

Art. 5, sec. 27, subsec. 3, *supra,* is, effective January 2, 1979, art. 5, sec. 24, subsec. 3.

argument on the proper scope of review to be utilized by this court and the parties were informed they could argue other points.

The case has now been reargued and the former opinion is withdrawn.[1a] The court has concluded that it is important to state the reasons and set forth the authorities which bear upon the two methods of review—substantial evidence test and independent review—as this is of major concern to the Commission as seen in its motion for rehearing. The court has also concluded that no significant purpose is served by readopting verbatim the very lengthy opinion previously issued in this case. The following then is a modified opinion on the whole case after rehearing. The scope of review matter will be treated at some length and then the various charges, findings, conclusions, recommendations, and this court's adjudication of them will be discussed.

## I

### *Scope of Inquiry by the Commission*

■ Respondent contends the violation of a provision of the Supreme Court Canons of Judicial Ethics is not, per se, sufficient to constitute an offense warranting discipline under art. 5, sec. 27, Mo.Const., or Rule 12.08. However, this contention has already been ruled upon adversely to respondent's contentions in *Matter of Kohn,* 568 S.W.2d 255 (Mo. banc 1978), to which earlier ruling we adhere.

## II

### *Scope of Review in Supreme Court*

It is the Commission's initial point that the findings and conclusions of the Commission are binding on this court and only the recommendation of discipline is subject to review here. This point is overruled and

the reasons therefor will appear infra in connection with the Commission's second position which is that this court's review is limited to a determination as to whether there is substantial evidence to support a finding or conclusion and that this court cannot, under the constitution, make an independent review of the findings made by the Commission.

In this connection, a substantial part of the Commission's motion for rehearing, brief and argument, concerns the court's holding in the earlier opinion that the court is not bound by the findings and conclusions of the Commission and the "credibility, weight, and value of the witnesses and the determination of all fact issues necessary to a decision in the case are for this court . . . ."—in short, that this court must make a de novo review of the facts—citing *In re Schiff,* 542 S.W.2d 771 (Mo. banc 1976), a lawyer disciplinary case, and *In re Duncan,* 541 S.W.2d 564 (Mo. banc 1976), a judge disciplinary case where we adopted the "preponderance of evidence" as the burden of proof because that was the burden in lawyer disciplinary matters. *In re Duncan* at 568, and *In re Fullwood,* 518 S.W.2d 22, 24 (Mo. banc 1975), recognized that the Missouri constitutional provision is patterned after the California constitutional provision. However, neither the standard of proof nor scope of review issue were the subject of challenge or detailed discussion in *Duncan* or *Fullwood.*

The Commission argues this court must defer to the Commission's findings of fact and restrict its review of such matters to the question of whether there is competent and substantial evidence to support the Commission's findings and not conduct a de novo review; that the attorney disciplinary case of *In re Schiff, supra,* is not sufficient or relevant authority for adopting a scope

---

**1a.** The former opinion devoted nearly 63 pages to detailing the evidentiary facts, findings and conclusions in the case but did not sufficiently articulate the rationale of "independent review". This opinion, after addressing the scope of review, will abbreviate the former opinion's factual recitation, take up and resolve the specific points made in the motion for rehearing, and set forth the court's decision on the issues, which remains essentially the same. The parties have copies of the former opinion and the original thereof will remain on file here and is, of course, subject to public inspection.

of review which requires this court to undertake a de novo evaluation of the evidence. Although the court is of the view that an *independent* evaluation is required in this type proceeding, the complaint regarding *Schiff* as being inadequate authority has merit.

Prior to the 1970 amendment to art. 5, sec. 27, Mo.Const., the only method of removing a judge from office for misconduct in office was by way of impeachment under art. 7, sec. 1, Mo.Const. Although *In re Mills*, 539 S.W.2d 447 (Mo. banc 1976), an attorney disbarment proceeding, is cited by the Commission as an alternative to impeachment prior to the amendment creating the Commission, the *Mills* case does not support an assertion that a disbarment proceeding can be utilized to oust a judge from office for judicial misconduct.

The removal of a judge from office for judicial misconduct by action of the Commission and this court is controlled by art. 5, sec. 27, Mo.Const., and the provisions pertinent to the instant matter are as follows:

Art. 5, sec. 27.1. "There shall be a commission on retirement, removal, and discipline, composed of . . .. The commission shall receive and investigate . . . all complaints concerning misconduct of judges, magistrates, . . ."

Art. 5, sec. 27.3. "Upon recommendation by an affirmative vote of at least four members of the commission, the supreme court en banc, upon concurring with such recommendation, shall remove, suspend, or discipline any judge or magistrate of any court . . . for the commission of a crime, or for misconduct, habitual drunkenness, willful neglect of duty, corruption in office, incompetency or any offense involving moral turpitude, or oppression in office. No action taken under this section shall be a bar to or prevent any other action authorized by law."

Art. 5, sec. 27.6. "Recommendations to the supreme court by the commission shall be made only after notice and hearing. Rules for the administration of this section and for the procedures thereunder shall be prescribed by supreme court rule unless otherwise provided by law."

Rule 12 was adopted by this court pursuant to subsection 6, *supra,* to implement art. 5, sec. 27.

Rule 12.08(a) and (b) in part requires the Commission to make an informal investigation of complaints, which are not obviously unfounded or frivolous, of misconduct, etc., and upon completion of the investigation, if four members of the Commission who have read the investigation find there is probable cause to believe the judge is guilty, the Commission is to institute a formal proceeding against the judge.

Rule 12.08 in part provides:

"Upon completion of the formal proceedings, if at least four members of the Commission who shall have been present and heard all the evidence find that the person proceeded against is guilty and further find that such person should be removed from office, suspended from the performance of his duties for a period of time or otherwise disciplined, the Commission shall make written findings of fact and conclusions of law with respect to the issues and shall make its recommendations to this Court.

"The Commission shall prepare a transcript of the record of all evidence and of all proceedings therein which shall also include its findings of fact and conclusions of law and recommendations, and shall file two copies thereof with the clerk of this Court.

"After respondent has had an opportunity to proceed as provided in Rule 12.09, this Court shall review the record, consider the recommendation of the Commission and make such order as to respondent as it deems just."

It is noted here that the constitution does not, per se, require the Commission to make findings of fact or conclusions of law. The constitutional provision requires the Commission to, when the Commission deems it advisable, make a recommendation of discipline to this court. However, in order for this court to know what the underlying

facts were which formed the basis of the conclusions and ultimate recommendation, the court by rule provided that findings of fact and conclusions of law be set forth by the Commission.

The constitution, art. 5, sec. 27.3, does not require the court to agree with the recommendation of the Commission. Indeed, the wording of art. 5, sec. 27.3, provides that the court shall discipline only "*upon* concurring" with the recommendation. It seems clear, therefore, that the court may constitutionally *not* concur. This provision is the one which makes discipline discretionary with this court.

■ It is also clear that the Commission cannot effect discipline. The constitution requires that discipline, when adjudicated, be adjudicated and imposed by the Supreme Court en banc, and, although deference should be shown to the recommendations of the Commission, the court is not bound by them.

■ How, then, can the court go about deciding whether or not to concur with the Commission's recommendation of discipline? It would seem that the court would, of necessity, examine into the evidence to decide whether it concurs with the fact findings and then whether it concurs with the conclusions that certain violations occurred. In other words—provide an independent review of the case. It is difficult to understand how this court could concur with the recommendation if it were not in agreement with the factual findings or the inferences drawn from those factual findings and set forth as conclusions of law.

The recommendations of the Commission do not come to this court as a judgment as do appeals from administrative agencies. Judgments are enforceable without approval of any appellate court; however, in the case of judicial discipline under art. 5, sec. 27, the recommendations are not enforceable of their own authority. That is because the constitution does not empower the Commission to effect discipline of its own authority. The body in which the constitution places the power to discipline

judges is the Supreme Court. Art. 5, sec. 27.3. As such, it becomes the obligation of this court to satisfy itself as to the facts underlying the adjudication of discipline. The motion for rehearing correctly asserts that the power to discipline attorneys is derived from the inherent power of the Supreme Court to regulate the practice of law within the judicial branch of government and not from any other specific grant of authority in the constitution. Likewise, the motion correctly asserts that the authority to discipline judges is derived from art. 5, sec. 27, which provides for the Commission, its power and duties, and assigns to the Supreme Court the duty to finally decide judicial discipline.

The two—attorney discipline and judicial discipline—are similar in that it is the Supreme Court in both instances that must finally adjudicate the discipline if any is to be assessed. The master in the case of attorney discipline proceedings and the Commission in the case of judicial discipline proceedings make "recommendations", not judgments.

The Commission's motion for rehearing cites many cases where the court held that the reviewing court's scope of review over an administrative agency is limited to deciding whether the findings of the agency are supported by competent and substantial evidence. Respondent's suggestions in opposition cite a number of cases from other states where the courts held that the scope of review the court must employ in reviewing a recommendation of a judicial disciplinary commission is that of an independent evaluation of the evidence. The reply suggestions of the Commission acknowledge an awareness of the judicial discipline cases from other states but argues they are irrelevant because, it is argued, the constitution of Missouri is different from that of other states, particularly California, Alaska, and North Carolina.

The constitution of Missouri has been quoted extensively supra but the provisions pertinent to this issue will be restated for ready reference. It is art. 5, sec. 27.3: "Upon recommendation by an affirmative

vote of at least four members of the commission, *the supreme court en banc, upon concurring with such recommendation, shall* remove, suspend, or discipline any judge or magistrate of any court or any member of any judicial commission or of this commission . . .." (Emphasis supplied.)

The reply suggestions of the Commission set forth the provisions of the following constitutions:

The California constitution provides in art. 6, sec. 18:

"(c) On recommendation of the Commission on Judicial Performance the Supreme Court *may* (1) retire a judge for disability that seriously interferes with the performance of the judge's duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, persistent failure or inability to perform the judge's duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. . . ." (Emphasis supplied.)

The Alaska statute provides in sec. 22.30.-070:

"(c) On recommendation of the commission, the supreme court *may* (1) retire a judge for disability that seriously interferes with the performance of his duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than six years before the commencement of his current term which constitutes wilful misconduct in the office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (Emphasis supplied.)

North Carolina provides in sec. 7A–376:

" . . . Upon recommendation of the Commission, the Supreme Court *may* censure or remove any justice or judge for wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. . . ." (Emphasis supplied.)

Before proceeding further, it should be noted that, as stated in the Commission's reply suggestions, the Commission *is* a constitutional body established by the constitution to investigate complaints, determine probable cause and initiate charges, hold evidentiary hearings and, as per the constitution, make recommendations of discipline to this court. Further, it is noted that if the Commission finds in favor of the judge, the file is closed and the matter is concluded. This is no small measure of power, authority and responsibility. The constitution does not, however, vest the Commission with the authority to, by its recommendations, put into effect the discipline it recommends. Absent a discipline order or judgment of this court, no discipline obtains. From the tenor of the Commission's brief and argument, it appears that the Commission feels the court has slighted it or denigrated its importance. This certainly was not intended then or now. The Commission is necessary to our judicial system and is very much needed and appreciated. It is necessary, however, to construe and apply our constitution and when that constitution places the authority to do an act in one body rather than another, this court must say so and abide by the constitutional mandate.

The issue of the scope of review of a commission's recommendations has been directly considered by the courts of other states but, except for preliminary or passing statements in some prior judicial disciplinary cases here, it has not been specifically decided.

First, as to our constitution as compared with those of some other states. As noted supra, the phraseology of our constitution differs facially from California, Alaska, and North Carolina. The constitutional provisions of those states, when referring to a

review of the *recommendations* of the commissions, say their supreme courts *"may"* retire a judge, censure him, etc. Each constitution provides what the court may do with respect to a specific matter and when it may act, to wit, *"Upon recommendation of the Commission, the Supreme Court may . . .."* These constitutions do not speak of the court "concurring" with the recommendations but simply use the word "may" with reference to the court's options.

Our constitution does not use the word "may". "Shall", which is a mandatory word, is used, but neither the Commission nor anyone else suggests that the word "shall" means the court must assess the discipline recommended by the Commission or that the court is *required* to concur with the Commission. It seems clear that the phrase "upon concurring with the recommendation" simply means that the court has the alternative to *not* concur with the recommendation. Our constitution by qualifying what the court *shall* do by making it (shall) contingent upon the court's concurrence with the Commission's recommendation, but not requiring concurrence, leaves it to the court to decide whether to concur or not. This grant of discretionary authority to the court makes our constitutional provisions, in essence, similar to the others cited supra. The brief of the Commission emphasizes the word "shall" and tends to ignore the contingency phrase "upon concurring with." Of course, the entire section must be read as a whole in order to discern its true meaning.

The Commission contends the constitution requires the court to agree with the findings of the Commission or, in short, to accept the findings of the Commission. If this is so, then what is the court to base a *"nonconcurrence"* upon? The underpinnings of the Commission's recommendation must, it would seem, be the Commission's findings upon which it then makes certain inferences and conclusions from which the Commission decides upon discipline—its recommendation. Thus, it would seem reasonable that the court must consider the underpinnings of the recommendation (evidence and findings) in order to decide whether it

should concur with the result—the recommendation. That is what the court has done in the instant case and because of the importance of the Commission and its work, has undertaken to delineate with particularity the basis upon which the court arrived at its judgment in the matter.

Shall the court review the evidence and make an independent evaluation thereof? The Commission argues we cannot or should not do so but, alternatively, to accept the Commission's findings the court must or should be limited to a determination of whether the Commission's findings are supported by substantial evidence.

The substantial evidence rule *requires* the court to concur in a finding even though the court, upon examining the evidence, is of the belief the finding was wrong, *if* there was substantial evidence favoring the finding. There can, of course, be *substantial* evidence pro and con as to any issue. This rule, nevertheless, has merit when the body from which the matter comes (administrative agency, court, or commission) has the power to make an adjudication of the matter which, absent appeals or mandatory review, is final. In the type of proceeding that is before the court, the body from which it came (Commission) did not, under the constitution of Missouri, have the power to make an adjudication of discipline which, absent supreme court action, could take effect or be final. In the words of the constitution, the Commission can *recommend* discipline but it (discipline) is not effective upon the Commission's recommendation—it is only effective when imposed or adjudicated by this court.

The Commission agreed that art. 5, sec. 27.3, places the ultimate responsibility for decision with respect to discipline in the supreme court. As will be seen infra, this fact was the principal basis upon which the supreme courts of California, Alaska, North Carolina, and others have determined they must conduct an independent review and not simply apply the substantial evidence test.

As noted supra, the constitutional provisions of Missouri were patterned after California, as was our implementing Rule 12. Also, as noted supra, art. 5, sec. 27.3 does not mandate this court's concurrence with the Commission's recommendation but permits nonconcurrence. Additionally, as noted supra, art. 5, sec. 27.3 places the ultimate dispositive decision as to discipline in the supreme court en banc.

In *Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (Cal. banc 1973), the court had this precise issue before it, and in *In re Hanson*, 532 P.2d 303 (Alaska 1975), the same issue was presented to and decided by the Alaska Supreme Court.

In an earlier case, *In re Robson*, 500 P.2d 657 (Alaska 1972), the Alaska Supreme Court said the substantial evidence rule was applicable to the review of judicial disciplinary commission recommendations. As noted, the "substantial evidence" rule restricts a court to a determination of whether or not there was substantial evidence to support a commission's finding.

Subsequently, in *Hanson, supra*, the Alaska court reversed the holding in *Robson, supra*, and concluded that an independent review, as required by California, was necessary. The part of the Alaska court's opinion, which includes portions of the California court's opinion in *Geiler* on this issue, appears in *Hanson* at 532 P.2d 308–309 as follows:

"The second preliminary matter which requires our examination involves the scope of this court's review of the evidence adduced before and the recommendation of the Commission. In *In re Robson*, we observed:

"Regarding the scope of review which this court should exercise in reviewing findings of fact of the commission, we see no reason to depart from the substantial evidence test which we have heretofore employed in reviewing matters coming to this court from administrative agencies and other governmental bodies.

In our opinion in *In re Robson*, we noted that the question of the scope of judicial review had 'not been alluded to in the parties' briefs.' Here the question has been briefed in connection with the instant petition, and we thus consider this an appropriate occasion to reexamine the scope of this court's review in judicial qualifications proceedings. It appears that Alaska is the only jurisdiction which follows the substantial evidence test in reviewing Commission factual findings. In other states, including California, the supreme court undertakes an independent evaluation of the evidence and the recommendation of the Commission.

"In *Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d 270, 110 Cal. Rptr. 201, 515 P.2d 1 (1973), the Supreme Court of California described its role as follows:

"We must . . . decide the appropriate standard for this court to employ in reviewing a recommendation by the Commission. Were this recommendation of independent force and effect absent further action by this court, our review of the evidentiary basis for that recommendation might properly be limited to a determination whether the Commission's findings of fact were supported by substantial evidence. . . [However], since the ultimate, dispositive decision to censure or remove a judge has been entrusted to this court, we conclude that in exercising that authority and in meeting our responsibility we must make our own, independent evaluation of the record evidence adduced below. After conducting such a review we may then decide as a question of law whether certain conduct, which we may have found as a fact to have occurred, was 'wilful misconduct in office' or 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' (Cal. Const., art VI, § 18.) Finally, it is to be our findings of fact and conclusions of law, upon which we are to make our determination of the ultimate action to be taken, to wit, whether we should

dismiss the proceedings or order the judge concerned censured or removed from office.

Article IV, section 10 of the Alaska Constitution and AS 22.30.070(c) unambiguously establish the Supreme Court of Alaska as the body entrusted with the ultimate dispositive decision in a judicial qualifications matter. In light of this constitutional grant and adopting the reasoning of *Geiler*, we conclude that this court's scope of review in a judicial qualifications proceeding should be that of an independent evaluation of the evidence." (Footnotes omitted.)

In *Hanson, supra*, the Alaska court also had presented to it a due process claim wherein it was contended that petitioner was denied due process because the Alaska commission had power both to conduct a preliminary investigation and to adjudicate and make a recommendation to the supreme court. This is, of course, what the Missouri commission does. This point is referred to here because of what the Alaska court said, in addition to other reasons, for rejecting the due process claim, 532 P.2d 307:

"In reaching our holding on petitioner's due process claim, we are additionally influenced by the fact that article IV, section 10 of the Alaska Constitution lodges in the Supreme Court of Alaska the exclusive adjudicatory power to suspend, remove from office, retire, or censure a justice or judge in the Alaska Court System. Since this constitutional provision vests in us the ultimate authority in disciplinary matters affecting the judiciary, we hold that petitioner's constitutional rights to the protection afforded

by due process have not been impinged upon."

The foregoing holding in *Hanson* preceded the decision that the review in the supreme court must be an independent one and we believe the recognition that the Supreme Court of Alaska has the exclusive adjudicatory power to discipline, as does this court here, was a significant factor in rejecting the due process claim as well as in adopting the independent review rule.

The reply suggestions assert the California and Alaska cases, cited supra, are distinguishable because in those cases the hearing was held before a master or masters, but not the commission itself. California's rule 907 provides, ". . . the Commission shall order a hearing to be held before it concerning the censure . . . , or the Commission may request the Supreme Court to appoint three special masters . . in the event that two-thirds of the . . Commission vote that this procedure be followed in a specified case, . . ." In Alaska, rule 9 allows the commission to order a hearing to be held before it or it may appoint a master to hear and take evidence. *In re Hanson, supra*, footnote 15 at 307.

Neither decision was predicated on whether the commission in California or Alaska held the hearing or a master held it. The commissions are, however, required to make their own findings of fact, conclusions of law, and a recommendation if discipline be recommended. The importance of these findings are set forth in *Spruance v. Commission on Judicial Qualifications*, 13 Cal.3d 778, 119 Cal.Rptr. 841, 844, 532 P.2d 1209, 1212–1213, footnote 5, which appear below in our footnote two.[2]

2. "Among the arguments addressed to the court in this case is one of first impression which we feel should be answered directly. The examiners have argued that the dismissal by the Commission of certain of the specifications of misconduct by petitioner should not necessarily be accorded conclusive effect. The examiners contend that two of the dismissed specifications (counts I–G and I–I) were proven by clear and convincing evidence and constitute conduct for which the Constitution authorizes the imposition of discipline (see *Geiler v.*

*Commission on Judicial Qualifications, supra*, 10 Cal.3d at pp. 283–284, 110 Cal.Rptr. 201, 515 P.2d 1) notwithstanding the fact that the Commission, in stating that the specifications were 'not sustained,' chose not to issue any findings of fact and conclusions of law. The examiners maintain that because we have undertaken to review the record ourselves and to adopt our own findings of fact and conclusions of law, it is within our power to find proven any of the charges lodged against petitioner upon which evidence was received regardless of the Com-

An exhaustive review of the problems of and procedures for judicial discipline on a nationwide basis is found in 54 Chicago-Kent Law Review 1–235 (1977), in a series of articles which compose the "Judicial Discipline and Disability Symposium". This symposium also contains the standards for judicial discipline adopted by the American Bar Association in 1978. It is not possible to summarize this entire article. However, it is stated that thirty-one states have followed what is commonly known as the "commission plan". There are a number of varieties in terms of size of commissions and various operating procedures but basically all have a permanent commission composed of judges, lawyers and nonlawyers that investigates, conducts hearings and recommends imposition of discipline to the highest court of state. Missouri is one of these thirty-one states that has adopted the unitary commission plan. 54 Chicago-Kent L.R. at 21.

The court has considered in depth all of the suggestions, arguments, and authorities

mission's disposition of such charges. We emphatically disagree.

"The Constitution clearly makes our power to discipline a judge for misconduct 'contingent on the Commission having so recommended.' (*Geiler v. Commission on Judicial Qualifications*, . . . 10 Cal.3d at p. 276, 110 Cal. Rptr. at p. 204, 515 P.2d at p. 4; Cal.Const., art. VI, § 18, subd. (c) . . . ) It would be entirely inconsistent with this constitutional division of functions for us to consider in passing on the Commission's recommendation any allegations of prejudicial conduct or wilful misconduct other than those which formed the basis of that recommendation. Unlike our statutory and inherent constitutional powers to control the professional conduct of members of the bar (see Bus. & Prof. Code, § 6107; *In re Hallinan* (1954) 43 Cal.2d 243, 253–254, 272 P.2d 768), our shared constitutional power to censure or remove a judge for misconduct does not permit us to impose such discipline on our own motion. (Cf. *Geiler v. Commission on Judicial Qualifications, supra* . . . )

"Moreover, the examiners' argument overlooks the dual function which the Commission performs. When considering the masters' report and deciding upon its own findings of fact and conclusions of law, the Commission acts in an adjudicatory role with the prosecutorial function left to the examiners. (See Rule 921(f).) But before us the Commission's role is exclusively that of an adversary, as the Commission is the respondent to the petition for a writ of review. (Rule 920(a).) The examiners appear before us merely as counsel to respondent. As such, the examiners are no more free than the Commission itself to argue against the validity of respondent's own adjudication of the facts and consequent conclusions of law. Its dismissal of certain of the specifications against petitioner having been based on its own evaluation of the evidentiary record in the light of the constitutionally ordained grounds for imposing discipline, the Commission is estopped from urging us, through counsel, to assess the record otherwise.

"For the foregoing reasons we conclude that the Constitution as well as sound procedure compel us to predicate our adoption, modification, or rejection of the Commission's recommendation solely upon those specifications in the Notice of Formal Proceedings which the Commission found both to have been proven as a matter of fact and to have constituted constitutionally sufficient grounds for the imposition of discipline. It would make a mockery of the constitutional requirement that our imposition of discipline on a judge be contingent '[o]n recommendation of the Commission' (Cal. Const., art. VI, § 18, subd. (c)), for us to contemplate basing our adoption or modification of such a recommendation on conduct which the Commission has not considered in formulating its recommendation.

"We wish to emphasize, however, that with respect to those specifications which have been found proven by the Commission and have been deemed by the Commission to be grounds for imposing discipline, and hence are properly before us in reviewing the Commission's recommendation that discipline in fact be imposed, we do not mean to intimate that this court gives dispositive effect to these determinations of questions of fact and law by the Commission. Such determinations are the condition precedent to our consideration of whether a judge is to be disciplined. This condition having been met, we regard it as established by Geiler that it is solely for this court to decide not only the question of fact whether the conduct in issue occurred but also, unfettered by the characterizations of the Commission, the question of law whether the proven conduct falls within the class of conduct for which the Constitution authorizes the imposition of discipline. (See *Geiler, supra*, . . . .) We reserve decision whether we are similarly unfettered by the nature of the discipline recommended by the Commission, to wit, whether our power to 'modify' a recommendation of the Commission (Rule 920(a)) would allow us to impose greater rather than lesser discipline than that recommended, and thus to remove from office a judge whom the Commission has recommended merely be censured."

put forth by the Commission and the respondent. Additionally, the Chicago-Kent L.R. reviews the disciplinary procedures in various states, including scope of review. In all states having a unitary commission proceeding where the commission recommends discipline, the scope of review is that of an independent review of the evidence and fact findings of the commission. The underlying common ground for this is that in those states, as in Missouri, the commission makes a recommendation which the supreme court is not required to adopt, and the ultimate responsibility for discipline is placed in the supreme court. No cases are cited by the Commission to the contrary and we have found none. The Proposed Standards Relating to Judicial Discipline and Disability Retirement which were adopted by the American Bar Association House of Delegates, February 14, 1978, became the "Standards" and represent a codification of the unanimous view found in court decisions with respect to scope of review of unitary commission recommendations. They are Standards 7.8 and 7.9 and appear at p. 229 of the Chicago-Kent L.R., *supra*, as follows:

> "7.8 *Determination of Facts.* The court should reach its own conclusion as to the facts found by the commission and as to the recommendation that discipline be imposed.

> "7.9 *Review on the Record.* The court should make an independent evaluation of the findings and recommendations of the commission."

For the foregoing reasons, the scope of review of judicial disciplinary matters in this court is an independent review as set forth in Standards 7.8 and 7.9. The court will, of course, give substantial consideration and due deference to the Commission's ability to judge the credibility of witnesses appearing before it. After doing so it will make its adjudication in accordance with the rules set forth supra.

**3.** If the Commission believes the notification procedure is unduly or unnecessarily cumbersome, the court would appreciate receiving any suggestions the Commission has regarding changes.

It is apparent from the resource material published for the National Conference of Judicial Disciplinary Commissions, the Chicago-Kent L.R., *supra*, and the Standards adopted by the American Bar Association, *supra*, that the unitary commission plan, as exists in Missouri, is the preferred method of dealing with judicial misconduct. This same literature makes it abundantly clear, as Judge Dowd, who is Chairman of the Missouri Commission, has done on appropriate occasions, that the contribution of non-lawyers and nonjudges to the work of these commissions has been of inestimable value to the total judicial system of this and other states. This court sincerely appreciates the dedicated work of the entire Commission.

### III.

■ Respondent asserts thirteen of the seventeen counts—number 4 and numbers 6 through 17—filed against him should be dismissed because he did not receive notice of thirteen of the counts in accordance with Rule 12.08(a).[3] Notice of those thirteen counts was not given in accordance with Rule 12.08. However, as a result of various conferences and continuances, we have concluded the respondent was not prejudiced by the Commission's order overruling his motion to dismiss. The question of notice was also considered in *In re Tracy Storie*, 574 S.W.2d 369 (Mo. banc 1978), and what is said there is reaffirmed here.

### IV.

The Commission found respondent guilty of counts 1(A), 2(A), 2(B), 2(C), 2(E), 3, 4, 5, 5(A), 5(B), 5(C), 5(D), 8, 9, 10, 12, 13, 14, 16, and part of 17, and not guilty of counts 2(D), 6, 7, 11, 15, and part of 17. There need be no further consideration as to the counts which respondent was found not guilty.

### V.

The charges, findings, conclusions, recommendations and adjudications.

## A.

Re: Respondent's actions in a certain custody matter or matters involving the minor child J.A.P. and his adoptive parents (hereafter mother or father or Mr. P. or Mrs. P.) who were divorced in 1973 or 1974. The events with respect to the minor child occurred in December 1976 and February 1977 and apparently triggered the initial complaint against respondent after which other complaints were filed. Counts Nos. 1(A), 2(A), 2(B), 2(C), 2(E), 3, 4, and 5 all refer to the parents' divorce and the child custody matter. The Commission considered this matter to be one of, it not the most grievous charge among the seventeen counts.

Briefly, the background is that in the late sixties respondent was practicing law and had handled two rather routine incorporations for Mr. and Mrs. P. and had also represented them in the adoption of the minor child J.A.P. Mr. P. had assisted respondent in his congressional campaign of 1968 by flying some campaign literature to respondent's house and he may have taken some part in the 1970 campaign of respondent for circuit judge. (In the 37th circuit of the state of Missouri, circuit judges are elected to office on a political party ticket in the same manner as other office holders, including county, state, and federal.) Respondent lost to the incumbent in the primary election of 1970 but was subsequently appointed to the position of circuit judge to fill the vacancy created by the death of the incumbent which occurred very early in 1971. Thereafter in 1972, the next general election after appointment, respondent obtained the nomination for one of the political parties, and in the general election of 1972 he was elected to the remainder of the deceased judge's term which was for a period ending December 31, 1976; he then was reelected at the general election of 1976 for a full term as circuit judge.

It appears that in May 1973 Mrs. P. sued Mr. P. for divorce and, on June 26 of that year respondent, in chambers and on his own motion, disqualified and gave directions for his clerk to notify the supreme court for appointment of a special judge.

Subsequent proceedings were before the special judge and a divorce was granted to Mrs. P. on or about November 30, 1973. Other motions and proceedings were had in this cause over the next two or three years during which time respondent either disqualified himself or was moved to disqualify himself. Also, in a criminal matter against Mrs. P., respondent disqualified himself in August of 1974. It would appear that up until December 23, 1976, that respondent had either disqualified himself on his own motion or on motion of a party to the litigation which involved either one or both of the P's four to seven times. It also appears that up until December 23, 1976, that, although there was much litigation taking place in the 37th judicial circuit between the P's or involving them, respondent took no significant part in any of the litigation.

On December 23, 1976, the father, by his attorney H. Lynn Henry, filed a motion to modify the previous divorce decree and a motion for temporary custody of the minor child J.A.P. The motion for temporary custody was sworn to by the father as was the motion to modify. At the time these motions were filed in the Circuit Court of Howell County, the child was in the temporary custody of the father and, except for the temporary custody order issued by respondent, would have been returned to the mother the next day. Without detailing the contents of the affidavit, suffice it to say that it alleged under oath that the mother and a male companion were engaging in an immoral and perverted sexual acts in the presence of the child; that the male companion committed physical and verbal threats against the child and other indecent acts—all of which, if true, would require action be taken for the welfare of the child. Respondent then, on or about December 24, 1976, issued an order placing temporary custody of the minor child with the father. This was done without prior notice to the mother. Under date of December 29, 1976, the summons was issued to the sheriff of Greene County for the mother and on December 30 the sheriff made his return showing service. On January 7, 1977, mo-

tions to set aside the temporary custody order and notice to call up motions were filed by the mother and on January 27 motions to dismiss and to strike were filed by her. Entry of appearances were subsequently filed and an application for change of judge was filed on January 31. On February 4, a minute entry shows that the application for change of judge was withdrawn, and respondent on his own motion disqualified and· requested the supreme court to assign another judge.

However, early in January the mother, by her attorneys, had filed a writ of prohibition in the court of appeals, Springfield district, which, either directly or alternatively, asked for habeas corpus relief—that is to say, the return of the child to the mother. On January 24, 1977, the court of appeals entered an order vesting custody of the minor child in the mother and ordered the mother not to remove the child from Greene County until further order of that court—all without prejudice to the father to make application to the appropriate juvenile court pursuant to chapter 211, RSMo 1969. Pursuant to that order the child was returned to the mother. On January 31, 1977, the court of appeals in *Ex parte J.A.P.*, 546 S.W.2d 806 (Mo.App.1977), issued its full opinion in the habeas corpus case. That opinion stated that the order of December 24, 1976, having been issued without any notice to the mother and without the conduct of a hearing at which evidence was adduced was beyond the jurisdiction of the Circuit Court of Howell County and was, therefore, void. The court said, among other things: "We find it unnecessary to detail the tumultuous events which have interlaced this matter since the initial divorce decree was made. It suffices to note the intervening contempt charges levied and the habeas corpus proceedings had are grim evidence of bitter self-interest on the part of the two involved adults which cannot help but have a disastrous effect upon the welfare and well-being of the innocent child." *Id.* at 807.

The court of appeals said that although the jurisdiction of a divorce suit or dissolution action remains exclusive in the circuit court where it was granted, the jurisdiction of the cause as it concerns child custody may still be affected or superseded by the juvenile court under certain circumstances. The court said that it refused to ingest the feeble claims that the ex parte order of December 24 was made under emergency circumstances or because the situation arose in an area where a "vacant spot" existed in the law to handle the immediate needs of the child's welfare. It pointed out the so-called emergency circumstances and the child's averred immediate needs stated in the father's motion to modify filed December 23, 1976, were not unlike those alleged in his motion to modify filed in June 1974.

Had matters stopped at that point, the error of respondent in issuing an ex parte order on December 24 would have stood corrected by the appropriate legal writ as was utilized in the Missouri Court of Appeals, Springfield district; the child would have been in the custody of its mother; a party could have required respondent to disqualify and the motion to modify could have proceeded in a proper manner with a special judge sitting. As noted supra, subsequent to the January 24, 1977, order of the court of appeals, the attorney for the mother moved for the disqualification of respondent and on February 4 respondent disqualified himself which, according to the minute entry, was on his own motion. Unfortunately, however, that did not end the matter.

The child was not in Howell County but rather was in Greene County with the mother. Nevertheless, respondent, having knowledge of the court of appeals opinion, proceeded to authorize the juvenile officer to prepare a petition with the purpose in view of taking the minor child into the custody of the Howell County juvenile court and there to determine the fitness of the mother and father and determine questions of custody with reference to the child. Respondent contends that he undertook this course of action because his reading of the court of appeals opinion indicated to him that the court of appeals was vitally concerned about the welfare of the child and

was in effect suggesting that juvenile procedures should be used for the child's welfare. This order was issued without prior notice to the mother or to her attorneys on February 5, 1977, at a time when the child happened to be in Howell County with his father.

The attorneys for the mother immediately applied for relief in the court of appeals, Springfield district. That court issued an order voiding respondent's juvenile court order and prohibiting him from proceeding further in the matter. The juvenile officer of Howell County, who is also an attorney, appeared before the court of appeals on the last matter noted supra and testified in these disciplinary proceedings that the order of the court of appeals was not issued because that court found the child was not in Howell County but rather because it found the court acted without a written complaint being filed pursuant to sec. 211.-081, RSMo 1969. The Howell County minute sheet in the case involving this minor child reflects that on February 4, 1977, there was an application for a change of judge filed by the mother. This was filed prior to any order being made or petition being filed with reference to the child. On February 5, 1977, the petition that was prepared by the juvenile officer was filed and it contained the order of respondent to take the child into custody. This was done in Howell County although respondent was not in Howell County on February 4 or 5 but rather was in Shannon County and it was there that he signed the juvenile court order.

■ The Commission found respondent guilty of violating Canon 3 A(4) which, inter alia, requires a judge to accord to every person legally interested in a proceeding or his lawyer a full right to be heard according to the law and, except as authorized by law, to neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.

In the circumstances as reflected by the evidence in this case, we are convinced that respondent should not have issued or instigated the issuing of any orders with respect to this juvenile in the face of the appellate court order which he knew about. This matter had been before the appellate court and if that court had believed the child was in danger it would not have issued the order returning the child to the mother. If that court believed that a particular juvenile court should undertake supervision of the child, it would have said so explicitly. In this instant matter, the respondent had in hand an appellate court order which was only a few days old when he, in effect, countermanded that order by taking the child from the mother in his role as juvenile court judge and by utilization again of an ex parte order. He disregarded the rights of the mother to whom the court of appeals had just returned the child. Respondent should not have issued the ex parte order as there was no emergency and his conduct gave the appearance of partiality toward the father and antagonism toward the mother. Respondent violated Canon 3 A(4) and in the circumstances related supra, this violation constituted misconduct in office for which he should be disciplined.

■ At the initial appeal and on rehearing, the Commission has strenuously argued that respondent failed to comply with Rule 51.05(a), the change-of-judge rule, and Rule 51.07, which sets forth the procedure after a judge is disqualified, and thereby violated Canon 3 A(4). In part, this position appears to be premised on the concept that because respondent had recused himself either on motion of a party or on his own motion in earlier stages of the divorce proceedings, respondent should or must therefore disqualify himself with respect to the motion to modify and to refrain from taking any action as juvenile judge. We have expressed our disapproval above with respect to respondent's instigation of juvenile proceedings in the particular circumstances of this case. However, whether or not a judge remains disqualified in proceedings that are had subsequent to the disposition of the main case is not, by rule or case law, sufficiently definite so as to premise discipline under art. 5 upon a judge's failure to disqualify of his own motion in the subsequent

proceedings. In *Ex parte J. A. P., supra*, the court of appeals declined to rule that matter, referring to *State ex rel. Ellis v. Creech*, 364 Mo. 92, 259 S.W.2d 372 (banc 1953), and *Prather v. Prather*, 263 S.W.2d 57 (Mo.App.1954). Lending further doubt to the proposition is *Wood v. Wood*, 378 S.W.2d 237 (Mo.App.1964), which holds the motion to modify to be a separate independent proceeding, and *Perryman v. State*, 506 S.W.2d 480 (Mo.App.1974), which holds that a judge who had been disqualified by a defendant in a criminal cause did not err in presiding and deciding the subsequent rule 27.26 motion brought to set aside the same criminal conviction.

The facts surrounding the issuance of the juvenile court order also convince us that respondent should have disqualified of his own motion from the issuance of any such order because, by that time, it was patent that his impartiality might very well reasonably be questioned and consequently he should have, pursuant to Canon 3 C(1), disqualified of his own motion.

The other charges made in connection with the child custody matter referred to above were, in our judgment, incidental to that which we have set forth above and need not be again dealt with separately.

### B.

Respondent was charged in Count 8 and found guilty in violation of Canons 1, 2 A, 3 A(1)(3), and supreme court Rule 12.23 because of remarks made by respondent to attorneys on or about March 18, 1977, when the attorneys were gathered in his courtroom. The remarks consisted of respondent informing the lawyers that he was being investigated by the Commission, requesting them to cooperate in the investigation, saying that his previous orders had been to protect the juvenile's mother, Mrs. P., and that he did not understand why he was being investigated. He told them who had been appointed as investigator for the Commission and asked the lawyers to cooperate with the investigator.

Rule 12.23, reference confidentiality proceedings, is primarily for the benefit of the party charged, the judge, and we do not believe the judge violates the rule by making public the investigation concerning him. If, however, his remarks bring the office of judge into disrepute, then he is not insulated from the consequences of such conduct just because he is under investigation. However, respondent's remarks did not show a lack of integrity or impartiality. He was not deciding any matter at that time. The respondent is not guilty of these charges.

### C.

Count 9 of the formal notice of the charges which was filed July 19, 1977, charged respondent with failure to promptly sustain an application for disqualification filed in the case of *State v. Oswald, Cunningham*, and *Goings*, in December 1974, contrary to Rules 30.03, 30.12, 51.05, and Canon 3 C(1).

With reference to the specific matter of *State v. Oswald, et al., supra*, the defendants were charged with a game law violation on December 4, 1974, by the prosecuting attorney and the case was set for trial on December 26, 1974. Defense attorney filed a motion for disqualification of judge and change of venue with affidavits attached and asked the prosecutor to bring the matter before respondent judge on December 18, 1974. The prosecutor later told defense counsel that he presented it but the judge did not rule on it that day and recommended defense counsel take the matter up with respondent. Defense counsel was unable to reach respondent immediately so he filed a petition for writ of prohibition in the court of appeals, Springfield district. A preliminary writ issued. On January 16, 1975, respondent sustained the motion and on January 27, 1975, the court of appeals by opinion dismissed the case as moot. *State ex rel. Oswald v. Buford*, 518 S.W.2d 690 (Mo.App.1975). The prosecutor testified that in his opinion respondent had not refused to disqualify himself but that he, the prosecutor, after seeing the affidavits, indicated to respondent judge that he, the prosecutor, desired to have a hearing in order

that he might interrogate the persons who signed the affidavits; that he was going to challenge the affidavits that were filed in conjunction with the motion for change of venue and change of judge. The testimony of the prosecutor is that he did tell Judge Buford of his desire to have a hearing on the motions and there is no indication that that testimony was considered as untrue. The findings of the Commission were that respondent did not rule on motions promptly and it was critical of respondent when respondent explained that for the previous three or four years he had tried to determine which motions to disqualify were serious. Upon the court of appeals issuing its provisional rule in *Oswald* which allowed respondent to enter an order changing the venue and disqualifying, respondent did so on January 27, 1975, after which the court of appeals, by opinion, dismissed the prohibition case as moot.

■ Respondent was represented in the prohibition action by the prosecuting attorney, as is customary. The prosecutor testified in this proceeding, as noted supra, that he was intending to challenge the affidavits filed in respondent's court. The prosecutor's position in the court of appeals cannot be discerned from the opinion. The prosecutor and defense attorney had previously discussed a plea bargain disposition before the motions were filed in respondent's court and the matter was disposed of by a plea in February 1975 in the same manner as originally discussed. The court of appeals pointed out in *State ex rel. Oswald v. Buford, supra*, at 691, that when *no issue is raised* or determined adversely to defendant in a criminal case as to the timeliness, form, sufficiency of its application and supporting affidavits, the duty of the judge to grant the change of venue and disqualification is mandatory and he exceeds his jurisdiction when he refuses to do so and subjects himself to superintending control by way of prohibition. What this holding *inherently recognizes* is that when the opposing party (in this instance the prosecuting attorney) does raise an issue with respect to the form or sufficiency of the application or supporting affidavits,

there can and should be a hearing afforded the prosecutor with reference to that matter. While we cannot discern precisely what the prosecutor's position was in the court of appeals on this matter, the fact remains that before the court of appeals issued its opinion the matter had become moot as respondent had sustained the motion.

Affidavits of disqualification of judge are still required in criminal cases, Rule 30.12, and there are a number of cases decided on appeal involving the correctness of denying such a motion. See Annotations under Rule 30.12 and sec. 545.660, RSMo 1969. As noted, the prosecutor intended to contest the motions and indicated the same to respondent.

■ As noted supra, the charge contained in count 9 did not allege anything beyond the specific occurrence in *State v. Oswald, et al.*, and that did involve a criminal case where, under the rules and applicable statutes, affidavits with respect to such motions are still required. The fact that respondent did not immediately sustain the motion to disqualify in the *Oswald*, et al., matter, may or may not have been contrary to criminal procedure Rule 30.01 et seq., so as to have afforded the defendants relief. However, even though a judge may fail to immediately disqualify himself and in so doing be in error, that does not mean that he is automatically in violation of Canon 3 C(1) which states that a judge should disqualify in a proceeding in which his partiality might reasonably be questioned, etc.

■ The court holds that the facts in evidence with respect to *State v. Oswald, et al.*, are not sufficient upon which to find respondent violated Canon 3 C(1).

The Commission also found that respondent engaged in a regular and consistent pattern of failing to rule on motions to disqualify because of his difficulty in determining whether or not the motions were "serious". This finding was principally based upon testimony of respondent who acknowledged he did not sustain motions for disqualification immediately upon filing

in the previous few years. He said that when he first became a circuit judge in 1971 he sustained all the motions promptly and advised the supreme court of the orders. He said that many of the motions were filed for delay and that the lawyers told him they really didn't want a change of judge in each instance and asked him to not rule on the motions until they called them up. After that occurred, respondent testified he did not immediately sustain motions but did try to determine which ones were filed in earnest and in many instances waited until the lawyers called up the motions. He said it was difficult to determine whether motions were really in earnest. Several attorneys testified as to the customs of the law practice in rural areas, such as respondent's circuit, and customs in urban areas which are quite different, and stated it was not unusual for judges in rural areas to hold up ruling on motions to disqualify until such motions were called up. Of course, in the *State v. Oswald* case mentioned *supra*, the defense attorney did not call up the motion or, for that matter, ever speak to respondent about it before proceeding with prohibition in the court of appeals.

This court, of course, expects the rules to be applied and enforced by the judiciary of this state, and motions to disqualify should be acted on *promptly* when called up or presented to a court. It is of some significance that respondent's practice to wait until the motion was called up before ruling on it was in response to requests of lawyers appearing in his circuit, and this had been the practice in his circuit over a substantial period of time.

There seems to be an assumption that a judge must rule on a motion for change of judge or change of venue promptly *when it is filed*. The moving party, however, should notice the other side as to when the motion will be called up, and then present it or call it up before the judge. As mandatory as it is that a *proper* motion for change of judge be sustained, the other party is entitled to notice and an opportunity to be heard, and he may contest the form, timeliness and sufficiency of the motion.

In *State v. Oswald, supra,* the defense counsel did not call the motion up. This matter occurred in December 1974 and as of November 1977 when the instant hearing took place, respondent only recalled that he tried to decide if defense counsel was serious. However, the prosecutor testified he asked the judge for a hearing, as he was entitled to do. The letter from the prosecutor to defense counsel dated December 18, 1974, purports to state what respondent would do with the case—that it would be tried unless there were compelling reasons offered as to why it should not be tried on December 26, 1974. The letter also states that the respondent "did not take up your motion for change of judge and change of venue". Then follows the prosecutor's comments about the affidavits in support of the motion, and again the statement that the judge "did not take up the matter" with a suggestion that defense counsel contact respondent judge.

As noted, defense counsel tried to contact respondent, but failing in that he immediately filed a petition for writ of prohibition in the court of appeals, Springfield district. The purpose of the prohibition was to prevent the trial from taking place on December 26, 1974, because defense counsel would not be ready for trial as of then and to require respondent to rule on relator's applications. The preliminary order of the court of appeal obviated the problem of a trial on December 26, 1974. However, whether or not the relator would have been entitled to an order compelling respondent to sustain the motions for change of judge and venue is highly doubtful. See *State ex rel. Huskey v. Eversole*, 177 S.W.2d 654 (Mo.App.1944), where mandamus was sought to compel respondent judge to grant a change of judge but relief was denied because relator had not "presented" the motion to the judge after filing the same.

A judge cannot properly *deny* a motion for change of judge on the basis that the movant is not *serious* about it, but a judge can wait until the motion is presented to him or "called up" before rul-

ing it. That, at least, would afford the other party the opportunity to be heard on the matter.

We want it clearly understood, however, that in Missouri a party has a *right* to disqualify the trial judge one time. No judge has *any right* to impede, forestall, or delay sustaining a motion for change of judge when it is timely filed in proper form and presented to the court. And this is so regardless of what the judge may think the movant's motives may be. In short, a party's motives have nothing to do with the matter. Nor is it of any consequence that the judge may feel personally slighted by the motion. His duty is to sustain it if it is in proper order. Trial court rulings on motions for change of judge or change of venue have been before appellate courts of this state in a number of cases. However, this is the first time the matter has been presented in the context of an ethical violation and we have, therefore, taken this opportunity to address the matter as set forth above, and it should be obvious that no judge has any right to penalize any party or lawyer because the lawyer frequently or routinely disqualifies a particular judge.

#### D.

Count No. 10 charged respondent permitted private arguments and ex parte communications with in-circuit attorneys regarding the dismissal of lawsuits pending in his court and encouraged oral "motions to dismiss" and regularly sustained the same without prior notice to opposing counsel contrary to Canon 3 A(4). This Canon states that a judge should accord every person who is legally interested in a proceeding or his lawyer a full right to be heard according to the law and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. The Canon then goes on and states: "A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding before him if he gives notice to the parties of the person consulted and the substance of the advice, and affords

the parties reasonable opportunity to respond."

Essentially, the charge noted supra is in two parts. First, respondent permitted private arguments and ex parte communications. Second, respondent dismissed cases without prior notice to the prejudice of out-of-circuit attorneys. In connection with this charge, the Commission received evidence of some specific cases in which a petition was dismissed and in each instance when the plaintiff's attorney desired the case reinstated, it was reinstated. The evidence with respect to this came into the case by way of docket sheets which generally showed the filing date, dates of service, and filing of answers, interrogatories, and then a date and entry showing dismissal of the cause. If there was a request for reinstatement of a case, this entry was also shown on the docket sheet. The principal evidence came from respondent with respect to his practices. In short, when respondent became a circuit judge in early 1971 he found the docket book to be about five inches thick in West Plains containing cases that were ten years old or older. Docket books in other counties in his circuit were just as bad. Respondent not knowing what to do with those cases talked with the attorneys and in some instances upon being told that a party was dead he would dismiss the case. He then started working through the older cases going through the files and he testified that he thought that in a two-week period he had weeded out some four or five hundred cases. He said he would go through a docket and if he found that a non-local attorney had only a motion, he would contact that attorney and ask him to write a letter or confer with opposing counsel to save a trip and he would also contact attorneys to remind them that an answer was due. Over several years, respondent relates that he cleaned out all of the dead cases. He further admitted that he occasionally got overzealous and when a case was thirty days old he would start suggesting to the lawyers that they take it up. He knew he was keeping his docket thin and thought the attorneys basically like that.

He said he did not realize that the lawyers felt that he was dismissing cases too soon.

In its motion for rehearing the Commission does not contend the court was incorrect in finding that the cases which were dismissed by respondent were dismissed on a regular law or term day; that respondent spoke to attorneys who were in court about these cases, that the parties received prompt notice of the dismissal and that respondent reinstated the cases upon request. The Commission does contend the court ignored the fact that respondent's conduct violated Canon 3 and dismissed the possibility of disciplinary action saying, "although respondent admittedly was overzealous in his attempt to keep his docket current, . . . none of the dismissals acted to the prejudice to the plaintiffs whose cases were dismissed." The Commission states that "adherence to the Rule is a preferable alternative to the respondent's practice."

It is certainly correct to say, as the Commission pointed out in its original brief, that whenever a case is dismissed by a court, even though without prejudice, the plaintiff's attorney must take some action to have the case reinstated and this, at least, constitutes an inconvenience and, in some instances, more trouble than a simple inconvenience. The legal effect of failing to give prior notice is that the dismissal is without prejudice to the refiling or reinstatement of the action. Canon 3 A(4) is not a rule of civil procedure nor can it be a substitute for such a rule. This Canon does not on its face prohibit a judge from dismissing cases without prior notice. The dismissal of cases without prior notice has not in the past been considered to be an *ethical* violation. *W. M. Crysler v. Smith, 377 S.W.2d 134 (Mo.App.1964). By stating the foregoing, this court is not be be understood as encouraging any practice of sporadically dismissing cases without prior notice even though the dismissal is without prejudice.* Insofar as the practice of respondent was concerned, it seems that he dismissed cases and then notified the attorneys of such dismissals and reinstated the cases if the attorneys so desired. In the process of doing this, however, respondent dismissed cases, even though without prejudice, in which only a short time had gone by in which no action had been taken. In one such case an attorney testified that another attorney told him that the second attorney had informed the respondent of the first attorney's request and the second attorney's request to set it down for trial, but that the respondent dismissed it, and the second attorney made the statement that the respondent "does these things sometimes." *It would seem obvious that the respondent should not have done this and was incorrect in so doing.* The Commission's finding, however, that there was a violation of Canon 3 A(4) is premised upon a practice, and not upon a few individual cases. Obviously, cases should *not* be dismissed when there has been recent action taken and when the parties are desirous of setting the case for trial. Some other circuits have specific rules with respect to when a case is subject to dismissal for failure to prosecute, and by reason of those rules the attorneys and parties know what to expect. This is the preferable way of handling the matter. Respondent should promptly consult with circuit judges from other circuits and promulgate and publish a rule, with a copy filed in this court pursuant to our rules, which rule would govern the procedure in the 37th circuit with respect to the dismissal of cases for failure to prosecute. It should provide for some prior notice. Any practice by which a judge randomly dismisses cases on any law or term day just because one of the attorneys is not present should no longer be engaged in.

The other aspect of this charge has to do with the allegation that respondent permitted private arguments and ex parte communications. Respondent testified that when he first became a circuit judge he would from time to time speak to an attorney for one of the parties with respect to the progress of a case. This would happen when he was going through the files in one of the four counties of the 37th circuit and it was for the purpose of learning whether

there was going to be any activity in the case. The evidence also shows that frequently the attorney in a case who did not office in the county where the case was pending would call an attorney in the county and ask him to tell the judge this or that, or as in the case of *Oswald, supra,* to bring a certain motion up before the judge. Requests for continuances were also handled in this fashion. The 37th circuit consists of four rather sparsely populated counties in which there is not an abundance of lawyers. The practice mentioned occurs in numerous courts throughout the state and this type of communication does not offend Canon 3 A(4).

### E.

Count 12 alleged: "That on or about the 29th day of March, 1977, and the 21st day of April, 1977, you did make a demand for money from Cameron Mutual Insurance Company under your official letterhead and did thereby fail to conduct your personal behavior beyond reproach and did thereby exploit your judicial position contrary to Canons 2 A; 5 C(1)." Respondent was involved in a rear-end automobile collision on March 3, 1977. An adjuster for the other driver's insurance company interviewed respondent about three weeks after the accident at the respondent's home and examined respondent's car. The adjuster thought there was between $300 and $400 damage to the car. Respondent told the adjuster he had a whip-lash-type injury, according to the adjuster, but that respondent would not file a personal injury claim because of his position as circuit judge. The adjuster already knew respondent was a lawyer and the judge of the 37th circuit. Under date of March 29, 1977, respondent wrote a longhand letter to the adjuster in which he set out the automobile damage repair costs, enclosed estimates of same,

and told about having to use a substitute automobile for five days while his car was being repaired. He again stated his neck had been stiff and sore every morning, described the pain and its duration in some detail, and then concluded by saying that his neck was sore in the morning, that he takes two to four aspirins by noon and doesn't have any further problems until the next morning. He stated there was muscle spasm in his neck, and said he believed he should be paid $2500 plus specials and asked to hear from the adjuster.[4]

The charge appears to be restricted to respondent's use of his circuit judge stationery. The adjuster knew respondent was a circuit judge and in his report to Cameron Mutual informed the supervisor of that fact as a matter of course. The use of the circuit judge stationery added nothing to the claim and the adjuster testified the letter could have been on any kind of stationery as far as he was concerned. We have reviewed the evidence presented in connection with this matter and have concluded that the use of the stationery was not violative of any rule of conduct.

As part of the Commission's finding with reference to count No. 12 the Commission found that "this insurance company [Cameron Mutual Insurance] was a defendant in litigation before respondent at various times." The Commission alleges that the court in its prior opinion failed to consider the fact that respondent dismissed the case of *Cameron Mutual Insurance Company v. St. Louis-San Francisco Railroad Company* on April 18, 1977, and reinstated the case on May 18, 1977, asserting that this constituted an exploitation of respondent's judicial position. Chronologically, the dismissal was after the automobile accident took place and the reinstatement was after the company settled the claim with respondent. There is no evidence in this cause that Cameron

---

4. In the original opinion it was pointed out that respondent offered to go to a doctor of the insurance company's choice, but was told that was not necessary and to see his family physician. The doctor he saw had been his family physician for twelve years, was the only doctor in the community and, according to the doctor's stationery, was the "county health officer, county physician and county coroner". There is no evidence in the record to support the Commission's charge that the doctor was on probation during this period or that respondent impeded any effort by the State Board of Healing Arts to investigate the doctor.

Mutual Insurance Company was a defendant in any pending litigation before respondent. The only reference in the transcript to any litigation wherein Cameron Mutual was a party was the case mentioned above and Cameron Mutual was a plaintiff—not a defendant. The only testimony with reference to this case and the dismissal of the claim was that the case was dismissed without prejudice with the approval of or at the request of the lawyer that represented plaintiff Cameron Mutual, and it was reinstated at the request of the same attorney. This case had been filed September 13, 1972, and had been passed at the request of plaintiff a number of times. Then, on December 17, 1976, the case was set for trial for March 15, 1977. A photocopy of the minute entries of this case was entered in evidence in this proceeding. Apparently the March 15th date went by without any trial having been had; the next entry is April 18th showing the cause dismissed without prejudice at costs to plaintiff, and this is then followed by an entry reinstating the cause. The adjuster for Cameron Mutual testified in this case as a witness for the Commission adverse to respondent with respect to respondent's personal injury claim and automobile damage. The only thing the adjuster testified to with respect to other cases was that he did *not* know that Cameron Mutual occasionally had cases pending in respondent's court. He gave no testimony with reference to the *Cameron Mutual v. Frisco Railroad* case, and there was no evidence of any connection between *Cameron Mutual v. Frisco Railroad* case and respondent's insurance claim. There is no indication that the Commission made any finding adverse to respondent with respect to the *Frisco* case.

Respondent's conduct in using his circuit judge stationery in filing and handling his claim for personal injury and property damage did not violate the Code of Judicial Conduct and did not constitute the exploitation of his judicial position contrary to Canons 2 A and 5 C(1).

*F.*

Count 13 charges: "That during your term of office you have discriminated against out-of-circuit attorneys and in favor of in-circuit attorneys contrary to Canons 1; 2."

The finding by the Commission with respect to this is: "Respondent has rather consistently discriminated against out of circuit attorneys and more often than not, also in favor of in circuit attorneys, contrary to Canons 1 and 2. There is no court rule requiring, nor is it possible for out of circuit attorneys to be constantly present on law days in the 37th judicial circuit, yet, Respondent consistently worked his docket on these days. *As a result,* cases were often dismissed when out of circuit attorneys were not present. The following are examples of the Respondent's discriminatory practices." (Emphasis ours.)

From the foregoing finding, it appears that the gravamen of the matter was the dismissal of cases at a time when an attorney for one of the parties, and against whom the dismissal would operate, was not present.

We note at the outset that this finding shows that the dismissals took place on law days. This is, of course, in accord with the testimony of respondent which was that he "worked his docket" on the scheduled law days. This procedure was well known to the attorneys both in and out of the circuit as it had been his practice since shortly after he became a judge. Of course, cases ought not to be dismissed for failure to prosecute or for lack of activity in the file until a reasonable time goes by with no action being taken in the case. However, the dismissal without prior notice operates as a dismissal *without prejudice* to the party seeking reinstatement of the cause or filing a new case. Also, as noted, supra, respondent reinstated the case on request. The finding also suggests that attorneys representing the parties need not be present on law day and stated, "nor is it possible for out of circuit attorneys to be constantly present on law days". We have addressed this problem supra and expect our observations to be followed. The exam-

ples given following the finding as set forth supra, however, do not relate to the dismissal of actions on law days.

In *Brewer v. Meeks,* attorneys from Springfield, Missouri, were retained by an insurance company to represent the defendant in the case. The plaintiff's attorney was a local attorney. The case was filed July 17, 1974, and proceeded with various pretrial matters, such as answers to the petition, interrogatories, etc., taking place. On March 11, 1975, the attorneys representing the defendant moved to withdraw from the case. Their withdrawal would also remove the insurance company from the case. This would leave the defendant unrepresented and uninsured. Plaintiff has some interest in whether or not the defendant was insured and plaintiff's attorney opposed the motion. The motion was argued before respondent and respondent overruled the motion. During the course of the arguments, and as plaintiff's attorney was opposing the withdrawal, respondent asked plaintiff's attorney what he would have to have to settle the case in order for the court to allow the withdrawal by defendant's attorneys from the case, and plaintiff's attorney said $10,000. Respondent told defendant's attorneys that if they settled with the plaintiff's attorneys for $10,000 the court would sustain the motion to withdraw. There was no evidence presented in favor of the motion. Respondent urged the attorneys to appeal if they felt he had erred. Defendant's attorneys sought a writ of prohibition from the court of appeals, Springfield district, seeking to prohibit respondent from proceeding further with the case on the grounds that he had abused his discretion (erred) in failing to sustain their motion to withdraw and the petition for the writ of prohibition was denied. Thereafter, defendant's attorneys sought a writ of prohibition in this court. This court issued an order stating that a provisional rule in prohibition would issue unless respondent permitted defendant's attorneys to withdraw on or before May 1, 1975, and notified this court of the order. Usually in extraordinary writ cases, the respondent judge is a nominal party and is represented by the

attorney who has been successful before the circuit court. That was true here and the attorneys representing plaintiff in circuit court were responsible for the pleadings in behalf of respondent in this court. There was no notification that defendant's attorneys had been permitted to withdraw so on May 5, 1975, our provisional rule issued returnable in thirty days. No return was filed so our provisional rule was made absolute. Whether or not the defendant in the underlying damage suit was or was not the actual insured of the company that had retained the attorneys to represent him is a fact, so far as the court knows, that has not yet been determined. The contention of defendant's attorneys that the named defendant was not actually their insured was, in the circuit court before respondent, only a contention. Our order that defendant's attorneys be permitted to withdraw occurred by default. Whether respondent actually erred in failing to permit defendant's attorneys to withdraw was never determined on the merits. The Commission alleges on rehearing that the court ignored the fact that another company sought to intervene to represent the defendant Meeks as an uninsured motorist. That entry in the file appears on a date subsequent to respondent's overruling of the motion to withdraw and it, therefore, could not have played any significant part in respondent's overruling the motion to withdraw. Furthermore, it should not have played any part in it. This is another instance where the facts of what took place were really not in dispute and the question actually is whether the respondent's order overruling defendant's motion to withdraw constituted discrimination against defendant's attorneys or "out of circuit" attorneys. This court has concluded that neither the denial of the defense attorney's motion to withdraw nor the inquiry regarding the possible settlement indicated discrimination. The ruling on the motion to withdraw may or may not have been legal error, but if it were, that is all it was.

In *McKee v. First National Bank,* another example given, a defense attorney from

Springfield, Missouri, filed a motion to disqualify respondent on July 29, 1975. On August 13, 1975, the court, on its own motion, set a court cost bond at $300 and, according to the testimony of the Springfield attorney, required that it be posted by 5:00 p. m. on that business day. The Commission determined that the requirement of a cash bond was an example of discrimination against "the Springfield attorney" and was exacerbated by the fact that respondent "did not have authority to make such an order after the motion to disqualify was filed." It was noted that the motion to disqualify was not ruled until September 23, 1975, nearly two months after filing of same. The docket sheet, a photocopy of which was supplied by the Springfield attorney who represented plaintiff McKee, shows this entry on July 29, 1975: "By clerk: Request for change of judge filed by plaintiff." The next entry is dated August 13, 1975, wherein the court required a $300 cost bond to insure payment of court costs "on or before September 22, 1975." One of the plaintiff's attorneys in the case testified that the bond was set at $300 solely because he had repeatedly disqualified respondent. The attribution of this motive to respondent is insufficient to support a finding of discrimination. The court has wide discretion under Rule 77.02 to require additional deposits for costs. This discretion, as any discretion, may be abused.

■ With respect to the filing of the motion for change of judge or disqualification, Rule 51.05 then and now requires that the party filing the application give notice to the other party when it will be *presented to the court*. This, of course, could be done by the other party, but regardless of which party does it, the matter should be called up before the judge for ruling. Although the rules have been changed over the years, the requirement that such a motion be called up and presented to the judge has not changed since the case of *State ex rel. Huskey et al., v. Eversole*, 177 S.W.2d 654 (Mo.App.1944), where it was held that mandamus would not issue to require a judge to disqualify himself unless it had been shown that the attorney seeking the mandamus and who had filed the application for the change had presented it to the judge. It was there held that the filing of same with the clerk is *not* presenting it for a proper order.

■ Nevertheless, a judge who makes discretionary orders in a case against the party who moved for his disqualification after the motion to disqualify is filed subjects himself to the criticism that the order was made *because* the change of judge motion was filed. The criticism is warranted on facial appearances even though it may not, in fact, be justified. This is so even though the judge has *jurisdiction* (authority) to enter the order because the change of judge motion has not yet been presented for ruling. It appears to have been imprudent for respondent to have issued the cash bond order when he did; however, it does not show a practice of discrimination against out-of-circuit attorneys.

The next example is the case of *Cook v. Patterson* where, without repeating all of the facts, it does appear that the motion for change of judge was called up and respondent should have sustained it promptly. The docket sheet on this case is not in evidence. Testimony of the attorney who filed the motion for change of venue and change of judge was that on his first appearance on the motions the judge said he was sustaining the motions but the judge failed to make the docket entry. The attorney returned again about a month later and brought the matter up and at the time the judge indicated he was going to rule on the change of venue first and then the change of judge. The attorney pointed out the rule to the court that required him to rule on the change of judge first. About twenty-five days after the attorney's second appearance, which involved a trip of approximately 125 miles, the respondent notified the supreme court to assign a special judge to the case. This motion should have been sustained when it was called up and presented to the judge, and from all that appears here the judge was incorrect in not doing so at that time. Respondent in this regard was in error, but removal from of-

fice is not warranted. This took place in the spring of 1975. The three cases related supra all involved the same law firm in Springfield. Another witness in this proceeding testified that the relations between the respondent and two members of this law firm have been "strained".

The fact that a relationship between a judge and a law firm or a lawyer is "strained" does not justify any different treatment of that lawyer from any other lawyer. As stated supra, the court should have sustained the motion for change in the *Cook v. Patterson* case when it was first presented to him. However, we believe that removal for such deficiency is not warranted.

*Old v. Old* involved another Springfield attorney and a local attorney. At a pretrial conference the local attorney related facts which were considered to be extraneous by the other lawyer. We have reviewed the facts in this matter and they do not sustain a conclusion that the judge was guilty of misconduct in failing to stop one of the attorneys from relating these extraneous facts. The motion for rehearing states the court ignored the fact that the in-circuit attorney was a defense witness at a hearing involving the client. We can find no indication or testimony anywhere that either attorney was a witness for either client at any hearing.

In *Hutcherson v. McMahon*, one of the examples cited, respondent denied a continuance where the attorney seeking it related that he was going to have to be in a hospital on the day the case was set for trial. The attorney informed the judge he would provide the judge with a medical report attesting to the need for his hospitalization on that particular day. The attorney did not communicate further with the court nor supply the medical report. The continuance was denied. The Commission, in its motion for rehearing, suggests that the court ignored the fact that the in-circuit attorney who opposed the continuance had professed that respondent would rule as the in-circuit attorney requested; that both (re-

spondent and the in-circuit attorney) would discuss the matter over lunch. These assertions were denied by the in-circuit attorney. A judge ought not to be found guilty of misconduct warranting removal based upon what one attorney said to the other attorney, particularly when his ruling does not appear to be erroneous. A similar ruling obtained in the case of *In re Marriage of Frankel*, 550 S.W.2d 896 (Mo.App.1977), where the court of appeals sustained the trial court's ruling denying a continuance even though the trial court was made aware of the fact that the party seeking the continuance was ill and unable to travel to St. Louis from New York for at least two weeks where the allegedly ill party failed to supply the court with a telegram from a physician attesting to the illness. The cause proceeded and the subsequent judgment was affirmed.

In *Hallmark v. Sloan* the respondent dismissed the case when it was called on term day because the attorney for the plaintiff was not present and no response was offered in his behalf. On motion by plaintiff's attorney, the cause was reinstated. Plaintiff's attorney did travel from Kansas City to respondent's court at West Plains in Howell County to present the motion for reinstatement and at that time retained a local attorney. The local attorney testified that he was not responsible for the reinstatement. There had been recent action by way of certain filings in the case and from all appearances it probably should not have been dismissed at that time. Nevertheless, it was dismissed when no answer was forthcoming from plaintiff's attorney at the term day docket call, as was the custom in respondent's circuit, after which plaintiff obtained a reinstatement of the case. This was in January 1975. The case then proceeded without further difficulty. In its motion for rehearing, the Commission suggests the court ignored the fact that the substitution was effected following five months in which respondent had not ruled on motions which were filed by the out-of-circuit attorney. It further states that once the local attorney was retained, respondent's cooperation was

achieved. The out-of-circuit attorney represented plaintiff. The suit had been filed August 15, 1974, with summons on the Howell County defendant obtained two days later. On September 16 defendant filed a motion to dismiss; on September 30 plaintiff filed a request for admissions; on October 7 defendant filed objections to the request for admissions; on October 10 plaintiff filed a notice to take up motions; on October 18 defendant's motion to dismiss was overruled and defendant was granted thirty days to plead. By agreement defendant was granted thirty days to respond to request for admissions filed by plaintiff; on November 15 defendant filed answers; on November 19 admissions and denials were filed by defendant; on December 3 answer to counterclaim was filed by plaintiff; and on December 20 and January 8 interrogatories were filed. It does not appear anywhere that respondent delayed in the ruling on any motions that were taken up before him. We reiterate, however, that cases should not be randomly dismissed simply because a lawyer is not present in court on a given law day when the case is not docketed to be called. Cases simply cannot continuously be in that kind of random jeopardy of dismissal. This problem has been solved in some circuits by adoption of reasonable rules, and that should be done in the 37th circuit also.

Three other matters are alleged in this connection. One is that a local attorney frequently ate lunch with the judge in either one or all four counties of the circuit; that respondent had granted a continuance to an attorney because the attorney wanted to take a vacation and because respondent proposed certain court rules, one of which suggested that out-of-circuit attorneys should consider associating a local attorney in cases which local attorneys would be familiar with the practices in the 37th circuit. In the earlier opinion the court dealt at length with each of these matters and determined that no misconduct had occurred. The Commission does not complain of this in its motion for rehearing.

## G.

Count No. 14 alleged that in April 1977 the case of *State v. Scott Henry*, in Oregon County, respondent made it appear that defendant's sentence was a result of plea bargaining when in fact it was not; that he did so in order to justify the sentence and in so doing he was swayed by partisan interests in fear of criticism contrary to Canons 1; 2 A; 3 A(1). Without detailing the events with respect to this, it is clear that the judge told the defense attorney that if the defendant pled guilty he would receive a $1,000 fine and there would be no jail time. Essentially, the prosecutor complains in these proceedings that the respondent made it appear that the plea bargain was struck between the prosecutor and defense attorney when the prosecutor claims he desired to try the case and did not agree to the disposition. When the matter was before the Commission, the Commission did not have the benefit of a transcript of the plea proceedings. A certified verbatim copy of those plea proceedings has been filed here by counsel for respondent and counsel for the Commission has not objected to supplementing the record in this regard and has used the supplemental transcript in the brief filed by counsel for the Commission. Before the Commission, the prosecutor testifying from his recollection said that the judge indicated to those present in the courtroom that the prosecutor had worked out the plea bargain in this particular marijuana case. The prosecutor testified that the judge had said in court, "That I had plea bargained to obtain the plea the night before, when I did not do that." We have read the transcript and no such statement appears. It is clear, however, that the prosecutor must have had some feelings with respect to what the judge was saying during the plea proceedings because, although remaining silent throughout the proceedings with reference to this matter, he did state at the conclusion of the proceedings the change he made in the amended information and that, "This prosecutor made no promises or recommendations to the court as to the range of punishment or what punishment this prose-

cutor desired." We have again reviewed the matter and have again determined that there was no violation of Canons 1, 2 A, 3 A(1).

## H.

Count No. 16 charges that on August 11 and 12, 1977, at a juvenile certification hearing in the matter of *State v. L. Z.,* that respondent threatened and intimidated the attorney for the juvenile indicating that respondent would get plaintiff (juvenile officers) to dismiss the certification motion to transfer the juvenile to the adult criminal court if the juvenile's attorney would dismiss certain pending civil rights actions and that respondent did thereby threaten to present criminal charges solely to obtain advantage in a civil matter contrary to DR 7–105 and in violation of Canon 1, Canon 2 A and Canon 3.

Respondent had been assigned as special judge to hear a certification hearing involving a juvenile in the 26th judicial circuit. This appointment as special judge was on August 2, 1977, and a hearing was scheduled to be held and was held on August 12, 1977. Prior to the hearing, the attorney for plaintiffs, juvenile officers, and the attorney for the juvenile were invited into the judge's chambers and the three of them conversed. During this conversation respondent referred to a pending civil rights action which had been filed by the attorney representing the juvenile in federal court in which the defendants named therein were the circuit judges of that circuit, the county court judges (administrative), and the sheriff. It sought injunctive relief regarding the child's right to a probable cause determination before he was detained as a juvenile; that he received "due process" before any punishment is imposed; a declaration that incarceration of juveniles with adults is unconstitutional; an order enjoining the operation of certain sections of the Missouri juvenile code, and the monetary damages against the circuit judges, county court judges, and the sheriff. During the course of the conversation in the judge's chambers, respondent alluded to the federal court case

and asked what it was about. The juvenile's attorney explained the case. Respondent "indicated" he thought the juvenile case and the federal case were interrelated or connected in some fashion in that the federal court judgment could nullify or have some effect over whatever respondent did in the juvenile case. The juvenile's attorney testified that he assured respondent that was not the case and that they were two entirely separate matters. Respondent said they couldn't pretend the matters were not at all caught up together and asked the juvenile's attorney what he wanted done. The juvenile's attorney said he wanted the juvenile matter disposed of under an interstate compact with probation for the juvenile either through the court or the division of youth services. The juvenile's attorney testified respondent said he considered it a part of his duties to settle matters amicably. Respondent, according to the juvenile's attorney, asked what he would give up to get the result he wanted and the attorney for the juvenile officers then said, "Look, you dismiss the federal lawsuit and we'll drop the motion to have your boy certified for trial as an adult." The juvenile's attorney then asked respondent what he thought about this offer, to which respondent replied that he viewed his responsibility to settle matters amicably. The juvenile's attorney then discussed the matter with his client and his client's parents and then advised the judge that they would not dismiss the federal case and accused the attorney for the juvenile officers of unethical conduct. The juvenile's attorney said he considered moving that the respondent be disqualified but did not do so because he thought that if the judge recused himself he would be admitting complicity in the offer and admitting to prejudice. The juvenile's attorney also felt that the boy was absolutely uncertifiable for trial as an adult. These observations, however, do not lend themselves to certain predictability.

Respondent should not have participated in any discussions pertaining to a possible withdrawal of the juvenile officer's petition in return for a dismissal of the federal court

action. In participating and giving tacit approval of this possible "trade-off", as the Commission found, the respondent's conduct could be reasonably seen, in the circumstances and facts of this matter, as giving the appearance of partiality toward the petitioners—juvenile officers and the other county and circuit court judges who had been sued in federal court—in violation of Canon 2 A. It also could reasonably be viewed as a willingness on the part of respondent to forego performing his duty of rendering a judgment on the merits with respect to the certification of the juvenile and either sustaining it or denying it and to allow the matter to go against the juvenile because the juvenile's attorney refused to accede to the proposed arrangements whereby the juvenile's attorney would dismiss the federal case. This constituted a violation of Canon 2 A in that his conduct with respect to this matter could reasonably have left the impression that his conduct of this hearing would not be impartial and that the matter had been decided by the juvenile's attorney's refusal to dismiss the federal court case and warrants discipline.

## I.

■ Count 17 charges that respondent from September 23 to October 5, 1977, in the case of *State v. Charles Hopkins*, threatened, abused, and intimidated the attorney for Hopkins relative to a brief the attorney had filed in the court of appeals, Springfield district, and threatened the attorney with contempt of court relative to the brief. The charge continued that respondent prevented the attorney from introducing evidence relative to the attorney's motion to withdraw his waiver of trial by jury—all in violation of Canons 1, 2 A, 3 A(1)(3). The Commission found respondent had not prevented the attorney from introducing evidence relative to the motion to withdraw a waiver of trial by jury. The Commission did find that respondent threatened, abused, and intimidated the attorney with the use of contempt charges in violation of Canons 1, 2 A, 3 A(1)(3). In short, Hopkins had been tried by a jury and convicted of murder in the second degree

with punishment assessed at twenty years' imprisonment. While the jury was out deliberating, respondent, the attorneys, and perhaps others, conversed and during this conversation respondent offered his view of the matter by saying that if the defendant had been tried to the court without a jury he would have acquitted him. The jury, however, found him guilty of murder in the second degree, but on November 4, 1975, respondent sustained Hopkins's motion for a new trial. Subsequently, respondent let it be known that if the attorneys representing the parties and Hopkins agree, he would be willing to have the case tried before him without a jury, or they could submit it to him on the prior testimony. The evidence demonstrates that the attorney representing Hopkins made it very clear to Hopkins that the judge would not indicate which way he would find. In January 1976 Hopkins appeared with his attorney before respondent and was interrogated regarding the waiver of jury trial and jury trial was waived. The respondent did not find Hopkins guilty of murder in the second degree but did find Hopkins guilty of manslaughter and assessed punishment at five years. The case was appealed, *State v. Hopkins*, 550 S.W.2d 947 (Mo.App.1977), and although Hopkins made no point of it, the court of appeals determined there had been no formal entry of verdict by the court and, therefore, dismissed the appeal and remanded the case to respondent with directions to "enter a verdict, receive and rule upon a motion for new trial, if any be filed, and to make an entry of final judgment in accordance with Rule 27.20." The brief for Hopkins on the foregoing appeal asserted that Hopkins had not intelligently and voluntarily waived his right to jury trial. The argument portion of the brief accused the judge, respondent, of wanting Hopkins to waive a jury trial and stated that respondent had previously advised defendant's attorneys that, had he tried the case, the defendant would have been acquitted. The brief went on to relate that the defendant had been interrogated by respondent with respect to plea negotiations and promises but alleged

that the respondent failed to interrogate the defendant with respect to whether there had been any indication made to him or his attorneys by the court as to what the court would do with regard to guilt or innocence. The brief then said, "This was critical. The defendant had been told by his own defense counsel and others that the judge had indicated he would find him not guilty if he had tried him without a jury. Of course the defendant waived a jury trial under this set of circumstances. Who wouldn't? . . . An indication to the defendant by the judge through defendant's attorneys that if he [the judge] had tried the case, the defendant would be found not guilty is likely to produce one result only: an eager, albeit involuntary, waiver of a jury trial based upon the certainty of acquittal."

Upon remand there were certain proceedings that took place before respondent. The court became upset with statements that were made by defendant's attorney in court and particularly those that had been made in the brief on appeal, believing that he was being charged with having tricked the defendant into waiving jury trial on the supposition the judge would find him not guilty and then finding the defendant Hopkins guilty. There was no evidence adduced that respondent did that. In those circumstances, respondent told the defense counsel that if he made similar pleadings or pleadings of that nature and filed to substantiate them with some evidence, the court would pursue the matter of contempt. That took place on October 5, 1977.

The accusation made in the brief against respondent was, in effect, that respondent tricked Hopkins into waiving a jury trial by saying he wanted it tried without a jury and he would totally acquit the defendant, but then convicted him. At the proceedings of September 23 and October 5, 1977, defense attorney offered all the evidence he cared to offer and there is no indication that he failed to offer anything because he felt intimidated. To have accused respondent of inviting the jury-trial waiver and trial to the court, and of assuring the defendant of an acquittal, if such be done on the transcript of the prior trial, and of then finding the defendant guilty, is improper. Respondent had a right, we believe, to caution defense counsel about statements. Respondent told defense counsel that he would be "held to account" if those statements were made in respondent's court.

This is not to say that a lawyer should not allege acts or facts of which his client has informed him even though such facts or acts may involve allegations of unethical conduct of another, be he judge or lawyer. This should be done with prudent language and with some factual basis. The allegations made by defense counsel in his court of appeals brief were intemperate, to say the least. Respondent, being a judge, should have been more temperate in his remarks to defense counsel. We do not believe respondent was guilty of constitutional misconduct however in expressing his views of the matter to defense counsel.

### J.

 As indicated *supra*, we are convinced that the conduct of respondent with respect to the juvenile matter of J. A. P. was improper for the reasons stated. The court of appeals opinion in that matter made it clear that the child was to be with his mother, and we believe it was made clear that respondent was not to interfere. It was highly imprudent and essentially wrong for him to have persisted with his intrusion into this matter.

Also, as indicated *supra,* respondent's conduct with respect to the juvenile court certification hearing of L. Z. gave the appearance that his ruling on the motion to relinquish juvenile court jurisdiction and to certify the juvenile for trial as an adult could be had by the simple expedience of dismissing the federal court action. That constituted misconduct.

Although we consider it to be somewhat dangerous to draw too many conclusions from the testimony given by numerous people in this cause, many of whom testified very favorably to respondent, and others to the contrary, yet we feel it important to

note that many of the pitfalls that have taken place could have been avoided had respondent formulated some reasonable rules and published them in order that the attorneys appearing in the counties of his circuit would know what to expect in connection with the matters on file there. Respondent has indicated he intends to do this and this court expects it to be done. The rules, however, must be reasonable and respondent could well consult with other circuit judges who have published rules with respect to dismissal dockets, the calling of dockets in cases, and other matters which ought to be routine in any circuit. It simply is not good for there to be "surprises" on docket days, term days, or law days. Clients pay for the lawyers' time and the lawyers should not be required to appear repeatedly merely for the purpose of making some routine announcement to a docket call. At the same time, however, attorneys must recognize that the judge has a responsibility for the disposition of the cases on file in his circuit and it is the judge who will be held accountable by this court for the performance of that function.

Proceedings such as this engender animosity among the witnesses and the parties and those "feelings" do not automatically disappear upon a final decision being rendered by this court. We can do nothing about the existence of hard feelings, however, we caution both the bench and the bar that the work of the circuit court in the 37th circuit must continue and must be done in a way that affords fairness to the litigants—the people. This *requires* reciprocal cooperation between the judge and attorneys and between the attorneys regardless of personality differences or personal feelings.

We would admonish respondent that respectful and courteous treatment should henceforth be extended to all appearing in his court, including those who were called to testify on behalf of the Commission or who may have cooperated in the investigation. We would also admonish the bar that when respondent resumes the bench he is, regardless of this hearing, entitled to the respect due other jurists of this state.

The Commission has recommended respondent be ousted from office. We have reviewed the underlying facts in evidence, the findings of the Commission, its conclusions, and its recommendations. Insofar as the facts as such are concerned, that is to say whether a particular event, such as whether or not a case was dismissed, or whether the respondent did or did not rule on a particular motion, there is really not a great deal of dispute. It is rather the inferences and conclusions to be drawn from those facts that is the area of some disagreement. We have given deference to the ability of the Commission to judge the credibility of witnesses who appeared before it in our review of this matter. In some instances, however, we have concluded that there was no evidence to support a particular finding or that the evidence does not justify a conclusion of misconduct. The court has also given serious consideration to the recommendation of the Commission. However, the court has concluded that respondent is not guilty of constitutional judicial misconduct sufficiently grave to warrant ouster. One cannot avoid the conclusion that respondent's personality grates on some of the attorneys. Nor, however, can the court avoid the observation that the people of the 37th judicial circuit elected respondent to the position of circuit judge on two occasions, and that the ouster of such an official is a very grave matter. We believe that what has been said supra ought to persuade respondent to give great thought to his manner of conducting court and the business of his circuit as it is not in the interest of the administration of justice that repetitive conflicts occur.

Suspension from office for long periods of time serve no good purpose because it merely means that another judge must do the work of the suspended judge, and long-term suspension may seriously impair the judge's ability to perform his duties when the suspension is over. Suspension for a reasonable period of time, however, serves the end of making it crystal clear that conduct complained of, and of which the judge has been found guilty, is serious and cannot be toler-

ated. It is substantially more than a public reprimand. The court believes that justice requires respondent be suspended from the office of circuit judge for a period of thirty days without compensation.

In *State ex rel. Huskey v. Eversole, supra*, the court of appeals, St. Louis district, found itself dealing with a judge and a lawyer who were at odds with each other and, quoting in part from the then American Bar Association's code of ethics, made a statement that is apropos here (177 S.W.2d at 657):

". . . 'It is the duty of the lawyer to maintain towards the court a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance.' It is likewise the duty of the judge on the bench to ever remember that he too is a lawyer, and for the time being occupying the high and honorable position of an impartial and disinterested judge, and he should never permit the ardor and zeal of the attorney in any case to cause him to lose his poise and dignity as a judge. So long as we all observe these simple ethical precepts, both judges and lawyers, regardless of personal likes or dislikes, the business of the courts will be transacted in an orderly manner, and citizens generally will have respect and confidence for our courts."

This court derives its power and authority from the constitution of the State of Missouri as does the Commission. Each has a separate function to perform under that constitution with respect to the discipline of the judiciary in this state. The duty of neither is pleasant but both must perform that duty with due regard for the function under our constitution of the other. This court is sincerely appreciative of the dedicated work of the Commission and desires to publicly acknowledge its thanks for the efforts of the members of the Commission.

It is the judgment of this court that respondent be and is herewith suspended from the office of circuit judge of the 37th judicial circuit for a period of thirty days without compensation, and the clerk of this court is directed to furnish and deliver certified copies of this opinion and order as provided in Rule 12.26.

MORGAN, C. J., and BARDGETT, SEILER and SIMEONE, JJ., concur.

WELLIVER, J., concurs in part and dissents in part in separate opinion filed.

DONNELLY, J., dissents in separate dissenting opinion filed.

RENDLEN, J., dissents in separate dissenting opinion filed.

WELLIVER, Judge, concurring in part and dissenting in part.

I would concur in the standard of review adopted by the majority in the per curiam opinion, and I have reviewed the record in accordance with the newly adopted standard.

The charges made against respondent and the findings made by the Commission are set forth in full:

That while holding the office of Circuit Judge in and for the Counties of Shannon, Howell, Oregon and Carter, Missouri, 37th Judicial Circuit, you engaged in the following conduct:

## CHARGE

*COUNT 1.* In the case of *Jimmy F. Perkins v. Alice F. Perkins*, Howell County Case No. 8396, you did the following:

*COUNT 1–A.* That on or about the 27th day of December, 1976, you did make an ex parte order regarding the custody of Jeffery Allen Perkins, at which time you were interested in said cause and, by reason of your previous disqualifications, in which your impartiality might reasonably be questioned, having previously disqualified yourself in *Alice Perkins v. Jimmy F. Perkins*, Howell County Case No. 6927 on June 26, 1973; in *Alice Perkins v. Jimmy F. Perkins*, Howell County Case No. 7301 on August 27, 1974; and in *State of Missouri v. Alice Perkins*, Howell County Case No. 3222 on August 23, 1974, contrary to *Supreme Court Rules 51.05(a)* and *51.07; Canon 3(A) (4).*

[All references to Canons pertain to the Code of Judicial Conduct as are set out in Supreme Court Rule 2].

## FINDING

*COUNT 1–A.* THE COMMISSION FINDS THAT PRIOR TO RESPONDENT BECOMING A JUDGE, HE WAS THE ATTORNEY FOR JIMMY AND ALICE PERKINS AND HAD REPRESENTED THEM IN TWO CORPORATE MATTERS AND IN THE ADOPTION OF THEIR ONLY CHILD. ALSO THE COMMISSION FINDS THAT JIMMY AND ALICE PERKINS ACTIVELY, AND WITH FULL KNOWLEDGE OF RESPONDENT, CAMPAIGNED FOR HIM IN POLITICAL ELECTIONS AND VISITED RESPONDENT IN HIS HOME. THE COMMISSION CONCLUDES THAT THE RESPONDENT'S IMPARTIALITY IN PRESIDING OVER ANY SUBSEQUENT LITIGATION INVOLVING THE PERKINS FAMILY MIGHT REASONABLY BE QUESTIONED. RESPONDENT'S LACK OF IMPARTIALITY IS DEMONSTRATED IN THE FOLLOWING TESTIMONY BY RESPONDENT:

". . . IT'S BECAUSE I KNEW HIM [JIMMY PERKINS]—I MEAN THE TYPE OF PERSON HE WAS, ANYBODY WHO KNEW HIM PERSONALLY COULD NOT FORM A RELATIONSHIP WITH HIM, JUST COULDN'T, HE'S A PRUDE, HE'S A BORE, HE'S JUST NOT PLEASANT TO BE AROUND. I NEVER HAD SO MUCH AS A CUP OF COFFEE WITH THAT MAN. NEVER. AND IT WAS BECAUSE I KNEW THAT HE HAD BEEN FIRED—I STILL BELIEVE HE WAS FIRED FOR IMPROPER RELATIONSHIPS WITH GIRLS AND I HAD ALSO HEARD THAT HE HAD SOME REAL QUEER IDEAS ABOUT SEX THAT HE PRACTICED WITH MRS. PERKINS OR FORCED HIS IDEAS ON HER, AND IT WAS BECAUSE OF THIS THAT I PRIMARILY DISQUALIFIED MYSELF. I DIDN'T KNOW WHETHER I COULD GIVE HIM A FAIR TRIAL, NOT HER. . . ."

BY REASON OF PREVIOUS DISQUALIFICATIONS, RESPONDENT'S EX PARTE ORDER OF DECEMBER 24, 1976 CHANGING THE CUSTODY OF THE MINOR CHILD OF THE PERKINS WAS ENTERED CONTRARY TO SUPREME COURT RULES 51.05(a); 51.07 AND CANON 3A(4).

## CHARGE

*COUNT 2.* In the case of *In the Interest of Jeffery Allen Perkins*, Juvenile Howell County Case No. 1087, you did the following:

*COUNT 2–A.* That on or about the 5th day of February, 1977, you did make an ex parte order at which time you were interested in said cause and by reason of your previous disqualification wherein your impartiality might reasonably be questioned, together with the fact that on February 4, 1977, you had disqualified yourself in the case of *Jimmy F. Perkins v. Alice F. Perkins*, Howell County Case No. 8396, contrary to *Supreme Court Rule 51.05(a); Supreme Court Rule 51.07.*

## FINDING

*COUNT 2–A.* THE COMMISSION FINDS THAT RESPONDENT'S EX PARTE ORDER OF FEBRUARY 5, 1977 WAS IN VIOLATION OF SUPREME COURT RULE 51.05(a), 51.07 AND CANON 3A (4). BY THIS TIME, RESPONDENT HAD DISQUALIFIED HIMSELF ON FOUR (4) PREVIOUS OCCASIONS IN MATTERS INVOLVING ONE OR BOTH OF THE PERKINS FAMILY AND HAD BEEN DISQUALIFIED TWO (2) OR THREE (3) TIMES BY MRS. PERKINS. HIS IMPARTIALITY, THEREFORE, MIGHT REASONABLY BE QUESTIONED.

## CHARGE

*COUNT 2–B.* Further, on or about February 5, 1977, you did order an ex parte Modification of Child Custody without service of the motions or notice to Alice F. Perkins, the mother and guardian of said child, or her attorneys, contrary to the *Con-*

stitution of Missouri, 1945 as amended, *Article I, § 10; Supreme Court Rule 55.26(a); Canon 3(A) (4).*

#### FINDING

*COUNT 2–B.* THE COMMISSION FINDS THAT THE EX PARTE MODIFICATION OF THE CUSTODY OF THE MINOR CHILD IN RESPONDENT'S ORDER OF FEBRUARY 5, 1977, WAS WITHOUT SERVICE OF THE MOTIONS, NOTICE TO ALICE F. PERKINS, OR JURISDICTION. REVISED MISSOURI STATUTE 211.031 WOULD GIVE RESPONDENT JURISDICTION OVER THE PERKINS BOY IF THE CHILD WAS A RESIDENT OF HOWELL COUNTY OR COULD BE FOUND WITHIN HOWELL COUNTY. HOWEVER, THE CHILD WAS CLEARLY A RESIDENT OF GREENE COUNTY. SECONDLY, THE RESPONDENT DID NOT KNOW THAT THE CHILD COULD BE FOUND WITHIN HOWELL COUNTY. JUDGE BUFORD STATED: "I DON'T KNOW WHERE THE CHILD WAS WHEN I SIGNED THIS ORDER, MR. WAMPLER. I REALLY DON'T. I THOUGHT THE CHILD WAS ENROUTE THERE." NOR WAS THERE ANY EMERGENCY, NEED OR REASONABLY APPARENT NECESSITY TO JUSTIFY THIS EX PARTE ORDER. FIRST OF ALL, THIS TUMULTUOUS LITIGATION OVER CHILD CUSTODY HAD BEEN DRAGGING ON FOR YEARS. SECONDLY, THERE WAS NO EVIDENCE OF DAMAGE, HARM, OR INJURY TO THE CHILD'S MORALS OR HEALTH IN HOWELL COUNTY. IN FACT, HAROLD HENRY, THE ATTORNEY IN WHOSE FAVOR THE EX PARTE ORDER WAS ISSUED, TESTIFIED THAT THE ONLY DANGER TO THE CHILD WAS IN GREENE COUNTY AND THAT THERE WAS NO DANGER FOR THE CHILD IN HOWELL COUNTY. THE COMMISSION CONCLUDES THAT THIS EX PARTE ORDER WAS MADE WITHOUT ADEQUATE INVESTIGATION, WITHOUT PROPER SERVICE OR NOTICE, AND WITHOUT JURISDICTION AND WAS, THEREFORE, CONTRARY TO ARTICLE I, SECTION 10, CONSTITUTION OF MISSOURI, SUPREME COURT RULE 55.-26(a), AND CANON 3A(4).

#### CHARGE

*COUNT 2–C.* That during February 3 through February 5, 1977, you did direct your Juvenile Officer and attorney David Neal to file such Juvenile Petition concerning a minor child, who was not a resident of Howell County or found within the county, and that you approved such Petition and made orders wherein no facts set forth the jurisdiction of the Court, contrary to RSMo *221.031(1); 211.091(2).*

#### FINDING

*COUNT 2–C.* THE COMMISSION FINDS THAT DURING FEBRUARY 3 THROUGH FEBRUARY 5, 1977, THE RESPONDENT DIRECTED HIS JUVENILE OFFICER AND ATTORNEY DAVID NEAL TO FILE A JUVENILE PETITION CONCERNING THE PERKINS CHILD. THE PERKINS CHILD WAS NOT A RESIDENT OF HOWELL COUNTY OR FOUND WITHIN THE COUNTY. CONTRARY TO RSMo 1969 211.031(1) AND 211.091(2), RESPONDENT APPROVED THE PETITION AND ENTERED AN ORDER WHEREIN NO FACTS SET FORTH THE JURISDICTION OF HIS COURT.

#### CHARGE

*COUNT 2–D.* Further, that on February 5, 1977, you did make orders and decrees and conduct a "hearing" in Shannon County in the case of *In the Interests of Jeffery Allen Perkins*, Howell County Case No. 1087.

#### FINDING

*COUNT 2–D.* THE COMMISSION FINDS NO CANONS, RULES, OR STATUTES PROHIBITING THE SHANNON COUNTY HEARING WHICH OCCURRED ON OR ABOUT FEBRUARY 5, 1977 IN THE HOWELL COUNTY CASE. THE RESPONDENT IS, THEREFORE, FOUND NOT GUILTY OF THIS CHARGE.

## CHARGE

*COUNT 2–E.* That from and after February 4, 1977, you did fail to sustain or act upon an Application for Disqualification by Alice F. Perkins in said cause, contrary to *Canon 2A; Canon 3(C)(1)(a); Supreme Court Rule 51.05.*

## FINDING

*COUNT 2–E.* ALTHOUGH IT IS NOT CLEAR WHETHER RESPONDENT EVER ACTED ON AN APPLICATION FOR DISQUALIFICATION BY ALICE F. PERKINS WHICH WAS FILED ON OR ABOUT FEBRUARY 4, 1977, AND SHORTLY THEREAFTER, CALLED TO THE ATTENTION OF RESPONDENT, IT IS CLEAR THAT FOR A PERIOD OF APPROXIMATELY THREE (3) MONTHS THEREAFTER, RESPONDENT DID NOT ACT ON THE DISQUALIFICATION. RESPONDENT'S TOTAL DISREGARD OF SUPREME COURT RULES CONCERNING DISQUALIFICATION IS REFLECTED IN THE FOLLOWING ADMISSION BY RESPONDENT: "IT WOULDN'T HAVE MADE NO DIFFERENCE IF I HAD BEEN DISQUALIFIED TEN TIMES, NO CHILD IN MY CIRCUIT IS GOING TO BE EXPOSED TO THIS KIND OF DAMAGE, MR. WAMPLER." THIS VIOLATED CANON 2A, CANON 3C(1)(a) AND SUPREME COURT RULE 51.05.

## CHARGE

*COUNT 3.* That in all matters affecting Alice F. Perkins, Jimmy F. Perkins and Jeffery A. Perkins, you did make orders and decrees affecting such person, having priorly represented Jimmy F. Perkins, and Alice F. Perkins, and having allowed Jimmy F. Perkins to contribute to your political campaign and visit you, at least twice, at your residence near Winona, Missouri, wherein your impartiality might reasonably be questioned and that you had a personal bias concerning Jimmy F. Perkins and personal knowledge of evidentiary facts concerning the proceedings, contrary to *Canon 3(C)(1).*

## FINDING

*COUNT 3.* THE COMMISSION FINDS THAT THE RESPONDENT HAD REPRESENTED JIMMY F. PERKINS ON THREE (3) OCCASIONS AND HAD KNOWINGLY PERMITTED JIMMY F. PERKINS TO CONTRIBUTE SERVICES TO PRIOR POLITICAL CAMPAIGNS OF RESPONDENT AND HAD ALLOWED PERSONAL VISITS OF JIMMY F. PERKINS TO HIS PERSONAL RESIDENCE. RESPONDENT'S IMPARTIALITY MIGHT, THEREFORE, REASONABLY BE QUESTIONED IN THAT RESPONDENT HAD A PERSONAL BIAS TOWARD JIMMY F. PERKINS AND PERSONAL KNOWLEDGE OF EVIDENTIARY FACTS CONCERNING THE PROCEEDINGS. THE SUBSEQUENT ORDERS BY RESPONDENT REGARDING THE CUSTODY OF THE MINOR MADE BY RESPONDENT WERE IN FAVOR OF JIMMY PERKINS AND WERE IN VIOLATION OF CANON 3C(1).

## CHARGE

*COUNT 4.* That during your term of office and particularly in the above stated matters affecting Alice F. Perkins, Jimmy F. Perkins and Jeffery Allen Perkins, you have failed to discourage ex parte applications, contrary to *Canon 3(A)(4).*

## FINDING

*COUNT 4.* THE TESTIMONY IS CLEAR THAT RESPONDENT REGULARLY RULES ON EX PARTE ORAL MOTIONS TO DISMISS, EX PARTE ORAL REQUESTS FOR TRIAL SETTINGS, AND EX PARTE WRITTEN MOTIONS FOR ORDERS INVOLVING CHILD CUSTODY. THE COMMISSION FINDS THAT RESPONDENT FAILED TO DISCOURAGE SUCH PRACTICES. ONE OF THE MOST FLAGRANT MANIFESTATIONS OF THE RESPONDENT'S POLICY OF ENCOURAGING EX PARTE APPLICATIONS ARISES IN SOME OF THE CORRESPONDENCE IN THE PERKINS

CASES. ON SEPTEMBER 14, 1974 JOHN HOLSTEIN, ATTORNEY FOR ALICE PERKINS, IN OPPOSING EX PARTE ORDERS BY RESPONDENT, SENT HIM THE FOLLOWING LETTER (COMM. EXHIBIT 11) WHICH WAS CAPTIONED WITH THE FILE NUMBER OF THE PERKINS' CASE:

"DEAR JUDGE BUFORD:

BEFORE SIGNING ANY ORDERS WITH REGARD TO THE ABOVE MATTER GRANTING INJUNCTIVE RELIEF, WOULD YOU PLEASE CALL THIS OFFICE COLLECT.

THANKING YOU FOR YOUR CONSIDERATION, I AM,

JOHN HOLSTEIN".

THE RESPONDENT'S HANDWRITTEN REPLY DATED SEPTEMBER 17, 1974, WAS AS FOLLOWS:

"DEAR MR. HOLSTEIN:

EX PARTE ORDERS WILL BE ISSUED BY THE COURT TO YOUR OFFICE AND ANY OTHER LAWYER WHEN PROPER PLEADINGS ARE PRESENTED AND THEREAFTER IT IS MY OPINION THE EX PARTE ORDER SHOULD BE ISSUED.

SINCERELY,

WINSTON V. BUFORD".

THE COMMISSION CONCLUDES THAT THESE AFORESAID EX PARTE PRACTICES, POLICIES, AND ORDERS BY RESPONDENT ARE ALL IN VIOLATION OF CANON 3A(4).

### CHARGE

*COUNT 5.* That you did fail to accord notice to attorneys Rich D. Moore and Douglas W. Greene, whom you knew were the then present attorneys for Alice F. Perkins, and whom you knew were interested in proceedings involving the custody of Jeffery Allen Perkins, and you did intentionally initiate and consider ex parte proceedings regarding such minor child in each of the following particulars:

*COUNT 5–A.* By reason of a letter of September 17, 1974, bearing your signature, to attorney John C. Holstein, the then attorney for Alice F. Perkins;

### FINDING

*COUNT 5.* THE YEARS OF 1973 THROUGH 1977 WERE YEARS OF ACTIVE LITIGATION IN THE PERKINS FAMILY. DURING THIS TIME, RESPONDENT KNEW THE WEST PLAINS LAW FIRM OF MOORE & BRILL REPRESENTED ALICE F. PERKINS AND WITH THE EXERCISE OF REASONABLE DILIGENCE COULD HAVE LEARNED THAT DOUGLAS W. GREENE ALSO REPRESENTED ALICE F. PERKINS. RESPONDENT DID INTENTIONALLY INITIATE AND CONSIDER EX PARTE PROCEEDINGS WITHOUT NOTIFICATION TO SUCH ATTORNEY INCLUDING THE FOLLOWING:

*COUNT 5–A.* RESPONDENT'S ANSWER TO A LETTER FROM ATTORNEY JOHN C. HOLSTEIN, ORIGINALLY DATED SEPTEMBER 17, 1974;

### CHARGE

*COUNT 5–B.* By reason of your Court Order of December 27, 1976, as more fully set out in Paragraph 1;

### FINDING

*COUNT 5–B.* BY REASON OF RESPONDENT'S COURT ORDER OF DECEMBER 24, 1976, WHICH CHANGED THE CUSTODY OF THE PERKINS CHILD FROM ALICE PERKINS TO JIMMY PERKINS:

### CHARGE

*COUNT 5–C.* By reason of your Court Order of February 5, 1977, as more fully set out in Paragraph 2D;

### FINDING

*COUNT 5–C.* BY REASON OF RESPONDENT'S COURT ORDER OF FEBRUARY 5, 1977, WHICH ORDERED THE DETENTION OF THE PERKINS BOY;

### CHARGE

*COUNT 5–D.* By reason of your acts from on or about February 3, 1977 through Feb-

ruary 5, 1977, wherein you did discuss matters concerning the custody of Jeffery Allen Perkins with Attorney Harold Henry and did direct that a Juvenile Petition be filed and make orders without first giving Alice F. Perkins or her counsel an opportunity to be heard, contrary to *Rule 51.07; Canon 3(A)(3); 3(A)(4)*.

### FINDING

*COUNT 5–D.* AND FURTHER, THAT RESPONDENT DID CONSIDER THE ENTIRE MATTER FROM FEBRUARY 3 THROUGH FEBRUARY 5, 1977, AND DIRECTED A JUVENILE PETITION BE FILED AND DISCUSSED MATTERS WITH ATTORNEY HAROLD L. HENRY WITHOUT GIVING ALICE F. PERKINS OR HER COUNSEL ANY OPPORTUNITY TO BE HEARD, ALL IN VIOLATION OF RULE 51.07; CANON 3A(3) AND (4).

### CHARGE

*COUNT 6.* That on or about February 5, 1977, you did threaten to cite the Marshal and Clerk of the Springfield Court of Appeals for Contempt of Court together with Attorney Douglas W. Greene, and did act in an irrational manner, conducting yourself so as not to promote public confidence in the integrity and impartiality of the Judiciary, contrary to *Canons 1; 2(A); 3(A)(1)(3)*.

### FINDING

*COUNT 6.* THE COMMISSION FINDS THAT THE RESPONDENT TELEPHONED WILLIAM C. COCKRILL, CLERK OF THE MISSOURI COURT OF APPEALS, SPRINGFIELD DISTRICT AND COMPLAINED ABOUT THE HEARING WHICH THE COURT OF APPEALS CONDUCTED IN THE PERKINS CASE. MR. COCKRILL TESTIFIED: "WELL, HE [JUDGE BUFORD] SAID SOMETHING ABOUT SOMEONE MIGHT—SOMEONE MIGHT GET IN CONTEMPT OVER THIS . . . " "AFTER THE CONVERSATION I THOUGHT HE MAY HAVE BEEN REFERRING TO ME OR THE MARSHAL." THE COMMISSION CONCLUDES THAT SUCH CONDUCT DOES NOT PROMOTE PUBLIC CONFIDENCE IN THE INTEGRITY AND IMPARTIALITY OF THE JUDICIARY, HOWEVER, THIS SOLE COMMENT DOES NOT RISE TO THE LEVEL OF MISCONDUCT AS CONTEMPLATED IN CANON 1, 2A, and 3A(1)(3). THE RESPONDENT IS, THEREFORE, FOUND NOT GUILTY OF THIS CHARGE.

### CHARGE

*COUNT 7.* That you did, by your letter of February 16, 1977, to Honorable Robert G. Dowd, state that you would state your reasons for making such contempt citations and that you would allege a detailed complaint against the Springfield Court of Appeals and Attorney Douglas W. Greene, but that you have failed to do so, contrary to *Canons 1; 2(A); 3(A) (1)(3)*.

### FINDING

*COUNT 7.* THE COMMISSION FINDS THAT THE RESPONDENT'S LETTER OF FEBRUARY 16, 1977 WAS NOT IN VIOLATION OF ANY CANON OR SUPREME COURT RULE. THE RESPONDENT IS, THEREFORE, FOUND NOT GUILTY OF THIS CHARGE.

### CHARGE

*COUNT 8.* That on or about March 18, 1977, you did make remarks from the Bench, after summonsing all available attorneys to be present, that you were being investigated by the Judicial Commission, that you had a hard time understanding "why you were being investigated, especially when you had gone out of your way to help Alice Perkins", all in an attempt to elicit sympathy, and obtain praise, contrary to *Canons 1; 2(A); 3(A) (1)(3)*.

### FINDING

*COUNT 8.* IT IS CLEAR TO THE COMMISSION THAT ON OR ABOUT MARCH 18, 1977, RESPONDENT, HIMSELF, DID VIOLATE SUPREME COURT RULE OF CONFIDENTIALITY AND SECRECY OF

THESE PROCEEDINGS. CONTRARY TO CANONS 1; 2(A); 3(A)(1)(3), AND SUPREME COURT RULE 12.23, RESPONDENT SUMMONED AVAILABLE ATTORNEYS TO BE PRESENT IN OPEN COURT, AND MADE REMARKS FROM THE BENCH CONCERNING THIS INVESTIGATION AND FURTHER, BY VIRTUE OF HIS REMARKS, DID ATTEMPT TO ELICIT SYMPATHY AND OBTAIN PRAISE. WHEN QUESTIONED ABOUT HIS REMARKS THE RESPONDENT STATED: "I WANTED ALL MEMBERS OF THE BAR INFORMED THAT I WAS BEING INVESTIGATED." ACCORDING TO NEWTON C. BRILL, THERE WAS "AT LEAST A DOZEN" ATTORNEYS PRESENT IN COURT WHEN THE REMARKS WERE MADE. SUCH REMARKS AND CONDUCT GAIN ADDITIONAL SIGNIFICANCE BY VIRTUE OF THE FACT RESPONDENT COMPLAINS OF ADVERSE PUBLICITY WHEN IT APPEARS THAT THE SOURCE OF SUCH PUBLICITY WAS THE RESPONDENT'S OWN STATEMENTS.

## CHARGE

*COUNT 9.* That on or about the 18th day of December, 1974, you did fail to promptly sustain an Application for Disqualification in *State of Missouri v. Oswald, Cunningham and Goings*, Carter County Case No. 236–A, 237–A and 238–A, *State, ex rel. Oswald, Cunningham and Goings v. Buford*, Missouri Court of Appeals, Springfield District, 9908, contrary to *Rule 30.03, 30.12, RSMo;* and *Canon 3(C)(1); Supreme Court Rule 51.05.*

## FINDING

*COUNT 9.* THE CASE OF *STATE OF MISSOURI V. OSWALD, CUNNINGHAM, AND GOINGS* INVOLVED WENDELL CROW OF KENNETT, MISSOURI AND THE LOCAL PROSECUTOR, LELAND NEEGARD. THE CHARGE WAS FILED ON DECEMBER 4, 1974 AND SET FOR TRIAL ON DECEMBER 26, 1974. ON DECEMBER 17, 1974, LELAND NEEGARD PRESENTED A DISQUALIFICATION MOTION ON BEHALF OF WENDELL CROW. RESPONDENT DID NOT RULE ON THE MOTION, BUT INSTEAD TOLD THE CLERK TO HAVE A JURY READY ON DECEMBER 26, 1974. WENDELL CROW WAS FORCED TO OBTAIN A PRELIMINARY WRIT OF PROHIBITION (*STATE EX REL. OSWALD V. BUFORD*, 518 S.W.2d 690 (MO.APP.1975)), BEFORE RESPONDENT FOLLOWED THE SUPREME COURT RULES AND SUSTAINED THE MOTION TO DISQUALIFY.

CONCERNING HIS FAILURE TO DISQUALIFY, JUDGE BUFORD ADMITTED THAT HE KNEW A MOTION WAS PENDING BUT EXPLAINED, " . . . I DIDN'T KNOW WHETHER THE LAWYER WAS SERIOUS OR NOT." THE SUPREME COURT RULES 30.03, 30.12, 51.05 CLEARLY DICTATE THAT A JUDGE SHOULD IMMEDIATELY SUSTAIN A MOTION TO DISQUALIFY. HOWEVER, JUDGE BUFORD DOES NOT FOLLOW THESE SUPREME COURT RULES BECAUSE HE IS NOT SURE WHETHER A MOTION IS "SERIOUS." HE STATES: "SO, I HAVE FOR THE LAST THREE OR FOUR YEARS HAD GREAT DIFFICULTY IN DETERMINING WHICH MOTIONS TO DISQUALIFY ARE SERIOUS."

THERE EXISTS A REGULAR AND CONSISTENT PATTERN OF THE RESPONDENT IN FAILING TO RULE ON MOTIONS TO DISQUALIFY BECAUSE OF HIS DIFFICULTY IN DETERMINING IF THESE MOTIONS ARE "SERIOUS." THIS IS CONTRARY TO SUPREME COURT RULE 30.30, 30.12, 51.05; CANON 3C(1).

## CHARGE

*COUNT 10.* That during your term of office, you have permitted private arguments and ex parte communications with in-circuit attorneys, regarding the dismissal of lawsuits pending in your court and have encouraged oral "Motions to Dismiss" and regularly sustained same, without prior no-

tice to opposing counsel, contrary to *Canon 3(A)(4)*.

### FINDING

*COUNT 10.* THERE APPEARS A REGULAR AND CONSISTENT PATTERN OF PERMITTING PRIVATE ARGUMENTS AND EX PARTE COMMUNICATIONS WITH IN–CIRCUIT ATTORNEYS. ALSO, NUMEROUS LAWSUITS WERE DISMISSED BY RESPONDENT, OFTEN UPON ORAL MOTION MADE BY IN–CIRCUIT ATTORNEYS AND MORE OFTEN THAN NOT, ON THE COURT'S OWN MOTION. THESE DISMISSALS WERE USUALLY WITHOUT PRIOR NOTICE AND RESULTED IN PREJUDICE TO OUT–OF–CIRCUIT ATTORNEYS. THIS FINDING IS SUPPORTED BY THE TESTIMONY OF SEVERAL LAWYERS AND JUDGE BUFORD'S OWN ADMISSIONS:

> "AND I SAY NOW TO THIS COMMISSION, I DID BECOME TOO ZEALOUS IN KEEPING MY DOCKET CLEAN; I DID BECOME TOO CONCERNED; I DID—I THINK I DID GO BEYOND PROPRIETY AND THE LAWYERS SOON LET ME KNOW AND I DID BACK OFF."

IN *FRIGIDAIRE v. LUNA*, JOHN PRATT, AN ATTORNEY FROM SPRINGFIELD REPRESENTED THE PLAINTIFF AND DON HENRY, A LOCAL ATTORNEY, WAS THE OPPOSING COUNSEL. ON AUGUST 8, 1976 MR. PRATT FILED A REQUEST FOR ADMISSIONS WHICH WAS NEVER ANSWERED. THE ATTORNEYS AGREED TO HAVE THE CASE SET FOR TRIAL BUT THE NEXT NOTICE MR. PRATT RECEIVED WAS A DOCKET SHEET STATING THE CASE HAD BEEN DISMISSED ON DECEMBER 17, 1976, AT PLAINTIFF'S COST. MR. PRATT TELEPHONED DON HENRY AND RELATED THEIR CONVERSATION AS FOLLOWS: "[H]E HAD INFORMED THE JUDGE OF MY REQUEST AND HIS REQUEST TO SET IT DOWN FOR TRIAL, BUT HE SAID THE JUDGE DISMISSED IT, MADE THE STATEMENT THAT THE JUDGE DOES THESE THINGS SOMETIMES."

THE DOUGLAS COUNTY CASE OF *STATE v. MARCHAR*, WAS MOVED TO THE RESPONDENT'S DISTRICT BY A CHANGE OF VENUE. LARRY LUNA, AN OZARK COUNTY ATTORNEY, WAS APPOINTED SPECIAL PROSECUTOR AND RICHARD MARTIN WAS THE LOCAL DEFENSE LAWYER. MR. LUNA TOLD RICH MOORE, ANOTHER LOCAL ATTORNEY, THAT HE WOULD PROBABLY NOLLE PROSEQUI THE *MARCHAR* CASE. A SHORT TIME LATER LARRY LUNA RECEIVED NOTICE FROM JUDGE BUFORD THAT THE CASE WAS DISMISSED. MR. LUNA TESTIFIED THAT HE NEVER DISCUSSED THE CASE WITH JUDGE BUFORD AND WAS NOT NOTIFIED BEFORE THE DISMISSAL.

THE EXTENT OF JUDGE BUFORD'S PRACTICE OF DISMISSING CASES WITHOUT NOTICE OF DUE CAUSE IS REVEALED IN ANOTHER OF JUDGE BUFORD'S ADMISSIONS:

> "I NEVER DISMISSED A CASE KNOWINGLY WITHOUT TELLING THE OTHER LAWYER, BY HAVING MY REPORTER DO IT OR HAVING THE CLERK DO IT, AND IF I HAVE I REGRET IT, IT CERTAINLY WAS NOT INTENTIONAL. FOR EVERY ONE I'VE DONE THAT WITH AN OUT–OF–CIRCUIT LAWYER, I CAN SAY TO YOU MEMBERS WITHOUT HESITATION I'VE DONE IT FIFTY TIMES TO THE IN–CIRCUIT LAWYERS. . . ."

THESE FINDINGS ARE ALL CONTRARY TO CANON 3A(4).

### CHARGE

*COUNT 11.* That during your term of office and in the course of your official conduct, your personal behavior has not been above reproach in that you have made continual and numerous comments requesting money (or making it appear as though you require money or special favors in order to

conduct your office), and that you have accepted gratuities, contrary to *Canons 2(A); 5(3)*.

### FINDING

*COUNT 11.* THE COMMISSION FINDS EVIDENCE OF THE RESPONDENT MAKING GESTURES AND COMMENTS REQUESTING MONEY IN EXCHANGE FOR CONDUCTING HIS DUTY. ATTORNEY NEWTON C. BRILL TESTIFIED THAT AFTER SIGNING AN ORDER JUDGE BUFORD WOULD ON OCCASION SMILE, RUB THREE FINGERS AGAINST HIS THUMB, AND ASK "WHAT WILL YOU GIVE ME?" ATTORNEY RICHARD MOORE ALSO WITNESSED JUDGE BUFORD'S HAND MOTIONS REQUESTING MONEY. ANOTHER ATTORNEY, RICH MOORE, RELATED AN INCIDENT WHERE JUDGE BUFORD TOLD ATTORNEYS IN HIS CHAMBERS " . . . THAT EVERY MAN PROBABLY HAS HIS PRICE . . " ALL THREE ATTORNEYS WHO TESTIFIED ON THIS ISSUE STATED THAT THEY BELIEVED THAT THE JUDGE WAS NOT SERIOUS WHEN HE MADE THESE GESTURES AND STATEMENTS. THE COMMISSION FINDS THAT THESE COMMENTS AND GESTURES WERE IMPROPER. HOWEVER, THE COMMISSION BELIEVES THAT THESE COMMENTS AND GESTURES WERE PROBABLY MADE IN JEST AND AS SUCH DO NOT RISE TO THE LEVEL OF MISCONDUCT AS CONTEMPLATED IN CANONS 2 A AND 5(3). THE RESPONDENT IS THEREFORE, FOUND NOT GUILTY OF THE CHARGE.

### CHARGE

*COUNT 12.* That on or about the 29th day of March, 1977, and the 21st day of April, 1977, you did make a demand for money from Cameron Mutual Insurance Company under your official letterhead and did thereby fail to conduct your personal behavior beyond reproach and did thereby exploit your judicial position, contrary to *Canons 2(A); 5(C)(1)*.

### FINDING

*COUNT 12.* THE COMMISSION FINDS THAT ABOUT MARCH 3, 1977 THE RESPONDENT WAS INVOLVED IN A MINOR AUTOMOBILE ACCIDENT. WHEN THE INSURANCE ADJUSTER, DON BATY, INTERVIEWED THE RESPONDENT, HE WAS TOLD THAT NO CLAIM WOULD BE FILED FOR PERSONAL INJURIES. BUT ON MARCH 29, 1977, THE RESPONDENT SENT A MONEY DEMAND FOR PERSONAL INJURIES TO THE CAMERON MUTUAL INSURANCE COMPANY ON OFFICIAL COURT LETTERHEAD AND STATIONERY. THIS INSURANCE COMPANY WAS A DEFENDANT IN LITIGATION BEFORE RESPONDENT AT VARIOUS TIMES. DON BATY REFERRED TO THE DEMAND LETTER AS FOLLOWS: "THE MAN WAS ALREADY AN ATTORNEY, IT WAS ON OFFICIAL STATIONERY, I SUSPECTED HE MEANT BUSINESS." MR. BATY NOTED THAT THE DEMAND WAS UNUSUAL IN THAT IT WAS NOT ACCOMPANIED BY A MEDICAL REPORT. IT WAS NOT UNTIL SEVEN WEEKS AFTER THE ACCIDENT THAT RESPONDENT SAW A DOCTOR AND OBTAINED A DOCTOR'S REPORT WHICH HE SENT TO CAMERON MUTUAL INSURANCE COMPANY ALONG WITH ANOTHER COURT LETTERHEAD DEMAND LETTER, DATED APRIL 21, 1977. THE DOCTOR WHO ATTESTED TO THE RESPONDENT'S INJURIES HAD RECEIVED PROBATION FROM THE RESPONDENT ON A PRIOR DRUG VIOLATION. THE COMMISSION CONCLUDES THAT THE RESPONDENT'S PERSONAL BEHAVIOR IN THIS MATTER DOES NOT PROMOTE PUBLIC CONFIDENCE IN THE INTEGRITY AND IMPARTIALITY OF THE JUDICIARY AND THAT HE USED AND EXPLOITED HIS JUDICIAL POSITION, CONTRARY TO CANONS 2 A AND 5 C (1).

### CHARGE

*COUNT 13.* That during your term of office you have discriminated against out-of-

circuit attorneys and in favor of in-circuit attorneys, contrary to *Canons 1; 2.*

## FINDING

*COUNT 13.* RESPONDENT HAS RATHER CONSISTENTLY DISCRIMINATED AGAINST OUT–OF–CIRCUIT ATTORNEYS AND MORE OFTEN THAN NOT, ALSO IN FAVOR OF IN–CIRCUIT ATTORNEYS, CONTRARY TO CANONS 1 AND 2. THERE IS NO COURT RULE REQUIRING, NOR IS IT POSSIBLE FOR OUT–OF–CIRCUIT ATTORNEYS TO BE CONSTANTLY PRESENT ON LAW DAYS IN THE 37TH JUDICIAL CIRCUIT, YET, RESPONDENT CONSISTENTLY WORKED HIS DOCKET ON THESE DAYS. AS A RESULT, CASES WERE OFTEN DISMISSED WHEN OUT–OF–CIRCUIT ATTORNEYS WERE NOT PRESENT. THE FOLLOWING ARE EXAMPLES OF THE RESPONDENT'S DISCRIMINATORY PRACTICES.

IN *BREWER v. MEEKS*, DONALD BONACKER AND JERRY REYNOLDS, TWO SPRINGFIELD ATTORNEYS, REPRESENTED AN INSURANCE COMPANY AND HAROLD HENRY WAS A LOCAL ATTORNEY FOR THE PLAINTIFF. DEFENDANT HAD OBTAINED THE INSURANCE POLICY NUMBER AND HAD THE FIRST AND LAST NAME AS THE POLICY HOLDER. THE DEFENDANT, HOWEVER, WAS NOT THE INSURED. DONALD BONACKER AND JERRY REYNOLDS DID NOT REALIZE THIS FRAUD UNTIL AFTER THEY HAD ENTERED THEIR APPEARANCES. JUDGE BUFORD'S DISCRIMINATION TOWARD LOCAL ATTORNEYS MANIFESTS ITSELF IN THE DIFFICULTY THAT BONACKER AND REYNOLDS HAD IN WITHDRAWING FROM THE CASE. DONALD BONACKER RELATES: " . . . [M]Y CONVERSATION WITH THE JUDGE WAS THAT IF HAROLD (HENRY) WOULD AGREE WE COULD WITHDRAW THEN HE WOULD SUSTAIN OUR MOTION." JERRY REYNOLDS APPEARED TO ARGUE THE MOTION TO WITHDRAW AND HIS DESCRIPTION OF A PRE–MOTION CONFERENCE IS AS FOLLOWS:

" . . . MR. HENRY STARTED TELLING THE COURT, JUDGE, I CAN'T LET THEM WITHDRAW. THEY INSURED—THEY COME IN THIS CASE AND NOW THEY WANT OUT OF IT. THAT TYPE OF LANGUAGE. AND AT THAT TIME I REQUESTED TO—THAT I WANTED TO TAKE UP MY MOTION TO WITHDRAW, MAKE FORMAL ARGUMENT ON THE MOTION. AT THAT TIME JUDGE BUFORD ASKED MR. HENRY HOW MUCH MR. HENRY WOULD HAVE TO HAVE TO SETTLE WITH OUR INSURANCE CARRIER SO THAT WE WOULD BE ALLOWED TO WITHDRAW FROM THE CASE. MR. HENRY SAID, 'JUDGE, I'D HAVE TO HAVE TEN THOUSAND DOLLARS TO LET HIM OUT.'

"AT THAT TIME JUDGE BUFORD ADVISED ME THAT IF WE SETTLED WITH HENRY FOR TEN THOUSAND DOLLARS THE COURT WOULD SUSTAIN OUR MOTION TO WITHDRAW FROM THE CASE."

THE MOTION TO WITHDRAW WAS OVERRULED AND BONACKER AND REYNOLDS WERE FORCED TO OBTAIN A WRIT OF PROHIBITION IN THE SUPREME COURT BEFORE THEY COULD WITHDRAW.

THE CASE OF *McKEE v. FIRST NATIONAL BANK*, INVOLVED JERRY REYNOLDS FROM SPRINGFIELD, MISSOURI AND NEWTON C. BRILL, A LOCAL ATTORNEY. ON JULY 29, 1975, REYNOLDS FILED A MOTION TO DISQUALIFY JUDGE BUFORD. THEN ON AUGUST 13, 1975, ON ITS OWN MOTION, THE COURT SET AN UNREASONABLY HIGH CASH COURT COSTS BOND OF $300 AND REQUIRED THAT IT BE POSTED BY 5:00 P.M. ON THAT BUSINESS DAY. IT WAS CLEAR THAT SUCH A BOND WAS NOT NEEDED OR SHOULD HAVE BEEN REASONABLY REQUIRED. IN FACT, NEWTON C.

BRILL TESTIFIED THAT HE DID NOT REQUEST A BOND IN THIS CASE. THIS DISCRIMINATION AGAINST THE SPRINGFIELD ATTORNEY IS EXACERBATED BY THE FACT THAT THE RESPONDENT DID NOT HAVE AUTHORITY TO MAKE SUCH AN ORDER AFTER THE MOTION TO DISQUALIFY WAS FILED. IT WAS NOT UNTIL SEPTEMBER 23, 1975, NEARLY TWO MONTHS AFTER IT WAS FILED, THAT THE MOTION TO DISQUALIFY WAS SUSTAINED.

*COOK v. PATTERSON*, INVOLVED JERRY REYNOLDS FROM SPRINGFIELD AND PAT FREEMAN, A LOCAL ATTORNEY. THE FOLLOWING FACTS RELATE THE DIFFICULTY ONE OUT–OF–CIRCUIT ATTORNEY HAD IN GETTING A MOTION TO DISQUALIFY AND CHANGE OF VENUE SUSTAINED IN JUDGE BUFORD'S COURT. ON FEBRUARY 10, 1975, JERRY REYNOLDS DROVE 125 MILES (ROUND TRIP) TO OREGON COUNTY TO DISQUALIFY JUDGE BUFORD. THE RESPONDENT TOLD MR. REYNOLDS THAT HIS MOTION WAS SUSTAINED BUT AFTER A LAPSE OF 20 or 30 DAYS, MR. REYNOLDS CALLED THE CLERK LONG DISTANCE TO DISCOVER THAT NO DOCKET ENTRY WAS EVER MADE OF THE DISQUALIFICATION. THE NEXT LAW DAY, MR. REYNOLDS AGAIN DROVE 125 MILES TO HAVE HIS MOTION TO DISQUALIFY SUSTAINED. THIS TIME RESPONDENT TOLD MR. REYNOLDS THAT HE WOULD RULE ON THE CHANGE OF VENUE AND THEN DISQUALIFY HIMSELF. MR. REYNOLDS OBJECTED AND SHOWED RESPONDENT THE SUPREME COURT RULE REQUIRING HIM TO RULE ON THE DISQUALIFICATION FIRST AND NOT THE CHANGE OF VENUE. NONETHELESS, RESPONDENT TOLD MR. REYNOLDS TO CONTACT MR. PAT FREEMAN AND SEE WHICH COUNTY MR. FREEMAN WANTED THE CASE SENT TO AS A RESULT OF A CHANGE OF VENUE. MR. FREEMAN INFORMED THE JUDGE THAT HE AGREED WITH MR. REYNOLDS THAT THE NEW JUDGE SHOULD BE LEFT TO RULE ON THE CHANGE OF VENUE. RESPONDENT AGAIN ADVISED MR. REYNOLDS THAT HIS DISQUALIFICATION MOTION WAS SUSTAINED, BUT UNFORTUNATELY, DID NOT MAKE A DOCKET ENTRY. ABOUT 20–25 DAYS LATER, MR. REYNOLDS AGAIN CALLED THE CLERK LONG DISTANCE TO DISCOVER THAT THE RESPONDENT WAS STILL PRESIDING OVER THE CASE. ON APRIL 30, 1975, MR. REYNOLDS WROTE THE RESPONDENT AND AGAIN ASKED THE JUDGE TO FOLLOW THE SUPREME COURT RULES. ON MAY 9, 1975, ABOUT THREE MONTHS AFTER IT WAS FILED, THE MOTION TO DISQUALIFY WAS SUSTAINED.

THE CASE OF *OLD v. OLD* INVOLVED DANIEL KNUST OF SPRINGFIELD AND HAROLD HENRY, A LOCAL ATTORNEY. HAROLD HENRY REQUESTED AND RECEIVED A PRE–TRIAL CONFERENCE. MR. HENRY THEN BEGAN TO RELATE TO THE JUDGE EXTRANEOUS FACTS WHICH WERE PREJUDICIAL TO MR. KNUST'S CLIENT. MR. KNUST OBJECTED, BUT MR. HENRY WAS ALLOWED TO RELATE HIS THEORY OF THE CASE. THIS THEORY WAS NOT IN THE PLEADINGS NOR WAS THERE ANY EVIDENCE TO SUPPORT IT FORTHCOMING IN THE TRIAL.

THE CASE OF *HUTCHERSON v. McMAHON*, IS ONE OF THE MOST GRAPHIC EXAMPLES OF THE RESPONDENT'S PREFERENTIAL TREATMENT FOR LOCAL ATTORNEYS. R. JACK GARRETT WAS THE LOCAL ATTORNEY AND JOHN ALPERS FROM TEXAS COUNTY WAS THE OPPOSING COUNSEL. MR. ALPERS DISCOVERED THAT ON THE TRIAL SETTING HE WOULD BE IN THE HOSPITAL UNDERGOING SURGERY ON HIS ARM. HIS ARM, WHICH HAD PREVIOUSLY BEEN BROKEN, WAS NOT HEALING AND HAD TO BE RESET. THE DOCTOR FEARED

THAT MR. ALPERS WOULD LOSE HIS ARM IF STEPS WERE NOT TAKEN TO PREVENT THE ONSET OF OSTEO-MYELITIS. R. JACK GARRETT DISCUSSED THIS MATTER WITH MR. ALPERS, BUT WOULD NOT AGREE TO A CONTINUANCE. MR. ALPERS THEN MADE AN ORAL REQUEST FOR CONTINUANCE WHICH WAS DENIED BY JUDGE BUFORD. HE THEN FILED A WRITTEN MOTION FOR CONTINUANCE SETTING FORTH HIS MEDICAL PROBLEMS. JUDGE BUFORD SET THE MOTION DOWN FOR THE DAY OF TRIAL. AS THE TRIAL DATE APPROACHED, MR. ALPERS CALLED R. JACK GARRETT ABOUT THE MOTION. GARRETT TOLD MR. ALPERS THAT ON THE DAY BEFORE THE TRIAL SETTING HE WOULD HAVE LUNCH WITH JUDGE BUFORD AND DISCUSS THE MOTION. MR. GARRETT CLAIMED THE JUDGE WOULD DO WHATEVER HE TOLD THE JUDGE TO DO. HE ALSO PROMISED TO CALL MR. ALPERS THAT AFTERNOON AND TELL HIM OF THE OUTCOME OF THE EX PARTE DISCUSSIONS. MR. GARRETT NEVER CALLED. MR. ALPERS ENTERED THE HOSPITAL AND THE NEXT DAY A DEFAULT JUDGMENT WAS ENTERED AGAINST MR. ALPERS FOR $63,000. PRIOR TO THIS JUDGMENT MR. GARRETT HAD OFFERED TO SETTLE FOR $6,500 AND MR. ALPERS HAD OFFERED $5,000. AN AFFIDAVIT OF MR. ALPERS' DOCTOR WAS ATTACHED TO THE MOTION FOR NEW TRIAL BUT THE MOTION WAS OVERRULED. APPEAL WAS TAKEN TO THE MISSOURI COURT OF APPEALS, SPRINGFIELD DISTRICT BUT BEFORE THIS APPEAL WAS COMPLETED, MR. ALPERS' CLIENT AGREED TO SETTLE THE CASE FOR $11,500.

THE FAVORED POSITION THAT R. JACK GARRETT HOLDS WITH THE RESPONDENT IS BETTER UNDERSTOOD WHEN WEIGHED WITH TESTIMONY OF THE LOCAL PROSECUTOR, W. SWAIN PERKINS. MR. PERKINS ESTIMATES THAT " . . . NINETY PERCENT OF THE TIME [JUDGE BUFORD AND R. JACK GARRETT] EAT LUNCH TOGETHER."

W. SWAIN PERKINS RELATES A CIVIL CASE HE HAD WITH R. JACK GARRETT AS OPPOSING COUNSEL. THE CASE HAD BEEN PENDING A LONG TIME AND MR. PERKINS WISHED TO TRY IT. JUDGE BUFORD GRANTED MR. GARRETT A CONTINUANCE SO HE COULD TAKE A VACATION.

THE RESPONDENT'S ATTITUDE TOWARD OUT–OF–CIRCUIT ATTORNEYS IS ALSO REFLECTED IN THE PROPOSED COURT RULES WHICH WERE WRITTEN BY THE RESPONDENT. RULE 7, IF ADOPTED, WOULD SUGGEST THAT ALL LAWYERS RETAIN A LOCAL LAWYER TO ASSIST IN HANDLING CASES IN THE RESPONDENT'S COURTROOM. SUCH A RULE IS CONSISTENT WITH THE PATTERN OF DISCRIMINATORY PRACTICES THAT THE RESPONDENT EXERCISED TOWARD OUT–OF–CIRCUIT ATTORNEYS. THE FOLLOWING ARE EXAMPLES OF THE PRESSURE THAT RESPONDENT EXERTED ON OUT–OF–CIRCUIT ATTORNEYS IN ORDER TO GET THEM TO RETAIN LOCAL COUNSEL.

DONALD E. BONACKER, A SPRINGFIELD, MISSOURI ATTORNEY RELATES THE FOLLOWING EXPERIENCE WHICH OCCURRED NEAR RESPONDENT'S COURTROOM: " . . . [T]HIS GENTLEMAN [JUDGE BUFORD] WALKED UP TO ME AND ASKED ME IF I HAD LOCAL COUNSEL. I SAID, 'NO,' AND HE SAID, 'THAT'S TOO BAD.' "

IN *HALLMARK CARDS v. SLOAN*, HALLMARK WAS REPRESENTED BY THEIR HOUSE COUNSEL FROM KANSAS CITY. FOR FIVE MONTHS, MOTIONS HAD BEEN PERIODICALLY FILED AND WERE STILL PENDING WHEN ON THE JANUARY TERM DATE, JUDGE BUFORD DISMISSED THE CASE BECAUSE THE HOUSE COUNSEL WAS NOT PRESENT. WHEN

HALLMARK CARDS JOURNEYED FROM KANSAS CITY TO FILE A PETITION FOR REINSTATEMENT, JOHN WILES WAS RETAINED AS A "LOCAL ATTORNEY." THE IN-HOUSE COUNSEL FOR HALLMARK HAD NO FURTHER DIFFICULTY IN KEEPING HIS CASE ON THE RESPONDENT'S DOCKET AFTER HIRING MR. WILES.

ALL THE AFORESAID DISCRIMINATIONS AND PREFERENCES ARE IN VIOLATION OF CANONS 1 AND 2.

## CHARGE

COUNT 14. That during approximately April, 1977, in the case of *State v. Scott Henry*, Oregon County case, you did conduct court and make statements to make it appear that your sentence was as a result of plea bargaining when in fact, it was not, in order to justify your sentence and you were swayed by partisan interests in fear of criticism, contrary to *Canons 1; 2(A); 3(A)(1)*.

## FINDING

COUNT 14. In *STATE v. SCOTT HENRY*, THE COMMISSION FINDS THAT IN MARCH 1977 PLEA NEGOTIATIONS TOOK PLACE IN THE RESPONDENT'S HOME. W. SWAIN PERKINS, PROSECUTOR, WAS PRESENT BUT NEGOTIATIONS TOOK PLACE ONLY BETWEEN THE RESPONDENT AND DEFENSE ATTORNEYS. MR. PERKINS WISHED TO TRY THE CASE, BUT RESPONDENT TOLD MR. PERKINS, "I THOUGHT YOU KNEW HOW TO SETTLE THESE MATTER[S] OR SETTLE CASES LIKE THIS." BOTH MR. PERKINS AND DEFENSE COUNSEL RAY LEE CASKEY TESTIFIED THAT MR. PERKINS MADE NO RECOMMENDATION IN THE CASE. THE NEXT DAY WHEN THE PLEA WAS TAKEN RESPONDENT MADE STATEMENTS FROM THE BENCH TO THE EFFECT THAT THIS SENTENCE WAS THE RESULT OF PLEA BARGAINING BETWEEN THE PROSECUTOR AND THE DEFENSE ATTORNEYS. THESE STATEMENTS BY RESPONDENT WERE MADE IN AN EFFORT TO JUSTIFY THE SENTENCE. THE COMMISSION FINDS THAT THE RESPONDENT WAS SWAYED BY PARTISAN INTERESTS AND FEAR OF CRITICISM, AND THAT HE MADE THE SENTENCING APPEAR AS THOUGH IT WAS THE RESULT OF A PROSECUTOR'S WILLING PLEA NEGOTIATION WHEN IN FACT, IT COULD NOT BE INTERPRETED AS SUCH. THE FOREGOING WAS IN VIOLATION OF CANONS 1, 2A; 3A(1).

## CHARGE

COUNT 15. That during your term of office you have failed to be patient, dignified and courteous to attorneys Jack Alpers and Rich D. Moore, contrary to *Canons 2(A), 3(A)(3)*.

## FINDING

COUNT 15. THE COMMISSION FINDS THAT ON ONE OCCASION THE RESPONDENT MADE THE FOLLOWING STATEMENT ABOUT JACK ALPERS IN OPEN COURT: ". . . [H]E'S NO DAMNED GOOD . . . HENCEFORTH THE WORD OF JACK ALPERS WILL NOT BE TAKEN AS THE TRUTH IN THIS COURT. HE CANNOT TELL THE TRUTH. HE DOESN'T APPEAR WHEN HE PROMISES TO DO SO."

THE COMMISSION ALSO FINDS THAT DURING THE TRIAL OF *STATE v. KEANEY* ACCORDING TO THE TESTIMONY OF RICH D. MOORE THE FOLLOWING OCCURRED:

". . . I THINK I MADE AN OBJECTION, THE JUDGE WAS LEANING BACK IN HIS CHAIR, AND HE ABRUPTLY CAME FORWARD AND I THINK HIT THE—HIT THE DESK OVERRULING MY OBJECTION. I WAS CONCERNED—I WAS CONCERNED ABOUT THE MANNER IN WHICH HE DID IT FOR FEAR THAT IT MIGHT AFFECT THE JURY AND I MADE A RECORD ON IT. DICTATED INTO THE RECORD MY CONCERN."

THE COMMISSION CONCLUDES THAT THIS CONDUCT DOES NOT PROMOTE PUBLIC CONFIDENCE IN THE INTEGRITY AND IMPARTIALITY OF THE JUDICIARY. HOWEVER, THE COMMISSION DOES NOT BELIEVE THAT THIS CONDUCT RISES TO THE LEVEL OF MISCONDUCT AS CONTEMPLATED IN CANONS 2A and 3A(3). THE RESPONDENT IS, THEREFORE, FOUND NOT GUILTY OF THIS CHARGE.

## CHARGE

*COUNT 16.* That on August 11 and 12, 1977, in the matter of *State of Missouri v. Leroy Zimmer* you did threaten and intimidate Attorney David C. Howard while said attorney was representing a juvenile. Attorney Howard had filed a civil rights action in the federal district court asking for declaratory relief, injunctive relief and damages challenging the constitutionality of the confinement conditions in the jail in which his juvenile client was incarcerated. That you indicated to Attorney Howard that you would get Plaintiff to dismiss its motion to transfer said juvenile to the Adult Criminal Court in return for said Attorney's dismissal of the then pending federal civil rights action, and that you did thereby threaten to present criminal charges solely to obtain advantage in a civil matter contrary to DR 7–105 and in violation of *Canon 1, Canon 2(a)* and *Canon 3.*

## FINDING

*COUNT 16.* THE COMMISSION FINDS THAT ON AUGUST 11, 1977, THE RESPONDENT TELEPHONED DAVID C. HOWARD, ATTORNEY FOR LEROY ZIMMER, AND ASKED HIM FOR HIS EXPLANATION OF THE FEDERAL CIVIL RIGHTS SUIT FILED ON BEHALF OF LEROY ZIMMER. ON AUGUST 12, 1977, A JUVENILE CERTIFICATION HEARING WAS SET FOR DAVID LEROY ZIMMER. PRIOR TO THE HEARING, A CONFERENCE WAS HELD IN THE RESPONDENT'S CHAMBERS. DURING THAT CONFERENCE THE RESPONDENT STATED: "I UNDERSTAND YOU'VE SUED SOME JUDGES", AND THEN ASKED ABOUT THE FEDERAL CASE. AFTER MR. HOWARD EXPLAINED THE NATURE OF THE FEDERAL SUIT, JUDGE BUFORD STATED "WE STILL CAN'T PRETEND THESE MATTERS AREN'T ALL CAUGHT UP TOGETHER" AND ASKED WHAT MR. HOWARD WANTED FROM THE CERTIFICATION HEARING. MR. HOWARD STATED THAT HE WANTED LEROY ZIMMER PLACED ON PROBATION AS A JUVENILE. JUDGE BUFORD THEN ASKED WHAT DAVID C. HOWARD "WAS GOING TO GIVE UP TO GET THAT DISPOSITION." MR. HOWARD ASKED FOR AN EXAMPLE OF WHAT THE RESPONDENT MEANT. DARRELL DEPUTY, JR., ATTORNEY FOR THE JUVENILE OFFICERS, STATED: "LOOK, YOU DISMISS THE FEDERAL LAWSUIT AND WE'LL DROP THE MOTION TO HAVE THE BOY CERTIFIED FOR TRIAL AS AN ADULT." MR. HOWARD ASKED THE RESPONDENT WHAT HE THOUGHT OF THIS OFFER AND JUDGE BUFORD REPLIED THAT "HE VIEWED HIS RESPONSIBILITIES TO SETTLE ALL MATTERS AMICABLY." THE COMMISSION CONCLUDES THAT THE RESPONDENT PARTICIPATED IN AND APPROVED PRE–TRIAL NEGOTIATIONS WHEREIN THERE WERE DISCUSSIONS THAT THE JUVENILE AUTHORITIES WOULD DISMISS A JUVENILE CERTIFICATION HEARING IF COUNSEL FOR LEROY ZIMMER WOULD DISMISS A PENDING FEDERAL CIVIL RIGHTS SUIT, ALL IN VIOLATION OF CANONS 1, 2A, 3 and DR 7–105.

## CHARGE

*COUNT 17.* That from September 23 to October 5, 1977 in the case of *State of Missouri vs. Charles Hopkins*, Missouri Court of Appeals, Springfield District, Mo. 9908, Howell County, Case No. 3302, you did threaten, abuse and intimidate Attorney John R. Pratt relative to a brief which he had filed in the Missouri Court of Appeals,

Springfield District and did threaten said attorney with contempt of court relative to said brief. The said appellant court had reversed the conviction wherein you were the trial judge. That you, by your actions, prevented Attorney Pratt from introducing evidence relative to his motion to withdraw his waiver of trial by jury, all in violation of *Canons 1, 2(a), 3(a)(1)(3).*

### FINDING

*COUNT 17.* THE COMMISSION FINDS THAT JOHN R. PRATT SUBMITTED A BRIEF TO THE MISSOURI COURT OF APPEALS, SPRINGFIELD DISTRICT WHICH WAS BASED ON ALLEGED EXTRA JUDICIAL STATEMENTS OF JUDGE BUFORD. THESE STATEMENTS WERE ALLEGED TO HAVE BEEN MADE WHILE THE JURY IN THE ORIGINAL TRIAL WAS DELIBERATING. THEY WERE TO THE EFFECT THAT IF THE JURY HAD BEEN WAIVED THEN THE JUDGE WOULD HAVE ACQUITTED THE DEFENDANT. IN A NEW TRIAL DEFENDANT WAIVED A JURY, BUT WAS CONVICTED BY RESPONDENT. THE MOTION FOR NEW TRIAL WAS SET FOR OCTOBER 5, 1977. ON SEPTEMBER 23, 1977, MR. PRATT CONFERRED WITH JUDGE BUFORD OVER THIS MATTER. THE RESPONDENT TOLD MR. PRATT IN CHAMBERS THAT IF HE MADE THE SAME STATEMENTS IN RESPONDENT'S COURTROOM AS WERE MADE IN THE APPELLATE BRIEF HE WOULD BE "CALLED TO ACCOUNT." THE RESPONDENT THEN REFUSED TO STATE ON THE RECORD IF HE HAD EVER MADE THE ALLEGED STATEMENTS. MR. PRATT KNEW THAT ON OCTOBER 5th HE MUST RECITE THOSE STATEMENTS DURING THE COURSE OF THE MOTION FOR NEW TRIAL. AS A RESULT HE FELT INTIMIDATED AND MADE ARRANGEMENTS FOR HIS LAW PARTNER TO STAND BY WITH BAIL MONEY UNTIL MR. PRATT WAS SAFELY OUT OF JUDGE BUFORD'S COUNTY. THE COMMISSION CONCLUDES THAT THE RESPONDENT UNREASONABLY THREATENED, ABUSED, AND INTIMIDATED ATTORNEY JOHN R. PRATT WITH THE USE OF CONTEMPT OF COURT CHARGES RELATIVE TO A LEGAL BRIEF HE FILED IN THE SPRINGFIELD DISTRICT OF THE MISSOURI COURT OF APPEALS, IN VIOLATION OF CANONS 1, 2A, 3A(1)(3). CONCERNING THE REMAINDER OF COUNT 17 THE COMMISSION DOES NOT FIND, AS A MATTER OF LAW, THAT THE RESPONDENT PREVENTED ATTORNEY PRATT FROM INTRODUCING EVIDENCE RELATIVE TO HIS MOTION TO WITHDRAW WAIVER OF TRIAL BY JURY. THE RESPONDENT IS, THEREFORE, FOUND NOT GUILTY OF THIS PART OF COUNT 17.

### RECOMMENDATION

AFTER THE FIVE DAY HEARING IT BECAME APPARENT TO THE COMMISSION THAT THE RESPONDENT LACKED A RUDIMENTARY UNDERSTANDING OF THE SUPREME COURT RULES, THE CODE OF JUDICIAL CONDUCT, AND THE STATUTES OF THE STATE OF MISSOURI. JUDICIAL MISCONDUCT WAS EVIDENCED BY THE RESPONDENT'S POLICY OF NOT RULING ON DISQUALIFICATION MOTIONS; BY HIS PRESIDING IN LITIGATION WHERE HE WAS BIASED TOWARD ONE OF THE PARTIES; BY HIS DISCRIMINATIONS AGAINST OUT–OF–CIRCUIT ATTORNEYS; BY HIS PROCEDURE OF ENTERTAINING EX PARTE APPLICATIONS AND DECISIONS; BY HIS VIOLATION OF THE CONFIDENTIALITY OF THESE PROCEEDINGS; BY HIS EXPLOITATION OF HIS JUDICIAL POSITION TO OBTAIN AN INSURANCE RECOVERY; BY HIS ATTEMPT TO BARTER THE DISMISSAL OF A JUVENILE PROCEEDING IN EXCHANGE FOR DROPPING A CIVIL RIGHTS ACTION; AND IN HIS THREATS TO USE CONTEMPT PROCEEDINGS TO PROTECT HIMSELF FROM INCRIMINATION. THIS MISCONDUCT RESULTS

IN BOTH A COMPLETE FAILURE TO PROTECT THE RIGHTS OF LITIGANTS, WITNESSES, AND ATTORNEYS AND AN EROSION OF JUDICIAL INTEGRITY.

THE COMMISSION, THEREFORE, RECOMMENDS THAT THE RESPONDENT BE REMOVED FROM OFFICE.

Most of the charges made by the Commission may be arranged and discussed in general categories. The charges will be addressed on this basis.

First, it was charged that respondent delayed in making orders for change of venue or disqualification of the judge; that he improperly refused to make orders disqualifying himself as judge; that he performed judicial acts in cases after the filing of motions to disqualify; that he improperly failed to disqualify himself on his own motion; that he refused to comply with mandates and orders of superior courts; and, that he had a practice of waiting to see if the parties were serious before ruling on motions to disqualify. These charges basically involve the Perkins matter in its entirety (Counts 1A, 2A, 2B, 2C, 2E, 5, 5A, 5B, 5C, and 5D) and the Oswald matter (Count 9).

Prior to December 23, 1976, respondent had either disqualified himself on his own motion or on motion of a party four to seven times. The copious record in this cause is replete with undisputed testimony of respondent's misconduct in the Perkins matter. On the father's motion for modification of December 22, 1976, respondent issued his ex parte order directing custody of the child be taken from the mother and awarded to the father. Learning of this order, the mother sought relief in the Missouri Court of Appeals, Southern District. On January 24, 1977, the court of appeals entered an order vesting custody of the minor child in the mother and ordered that the child not be removed from Greene County until further order of that appellate court, without prejudice to the father making application to an appropriate juvenile court pursuant to Chapter 211, RSMo 1969. The child was returned to the mother pur-

suant to that order. This appellate court order was followed by a full opinion of the court of appeals on January 31, 1977, in the case styled *Ex parte J.A.P.*, 546 S.W.2d 806 (Mo.App.1977). In that opinion the court of appeals found there was simply no basis upon which to premise a change of custody order by way of any so-called emergency. Nevertheless, in less than a week after receipt of the order and opinion of the court of appeals, respondent in his capacity as juvenile judge, through his juvenile officer in Howell County, instigated a proceeding in which he issued an order, which if carried out would have denied custody to the mother. That order was issued on or about February 5, 1977, when the child happened to be in Howell County with the father. The mother again applied for immediate relief in the Missouri Court of Appeals, Southern District, and that court promptly issued an order voiding respondent's juvenile court order and prohibiting respondent from proceeding further in the matter.

Respondent sought to justify his conduct of February 5 on the grounds that he was concerned for the welfare of the child. This explanation flies in the face of the record, and this explanation was apparently, with complete justification, disbelieved by the Commission. The record shows that this very contention had been considered by the appellate court as shortly as one week earlier and if that court has believed the child was in danger it would not have issued its second order returning the child to the mother. Respondent having in hand an appellate court order which was only a few days old, evaded and in effect countermanded that order by taking the child from the mother in his role as juvenile judge.

The evidence on all of the disqualifications is virtually undisputed and speaks for itself. The findings of the Commission on these counts are supported by the record. This misconduct is highlighted against the backdrop of a turbulent history of prior litigation involving this mother, father and minor child, and the several prior disqualifications of respondent in those matters. It is clear that respondent's conduct was not

only highly improper when he instigated such proceedings and entered his ex parte orders, but the record reveals that he should instead have sua sponte disqualified himself in the case. In my judgment respondent's actions constituted misconduct in office for which he should be disciplined, and indeed the Perkins matter alone seems sufficient to warrant his removal.

Second, it was specifically charged that respondent attempted to force settlement of a federal case against certain judges as a condition precedent to ruling in a juvenile certification hearing in the Zimmer case (Count 16).

Deferring to the Commission on the question of credibility of the witnesses, I find the charge supported by the record.

Third, respondent was charged with dismissing cases without notice. There is no dispute on this issue. The dismissals speak for themselves, Respondent also admitted that he may have gone too far with dismissals in his efforts "to clean his docket."

I find no problem in adopting the findings of the Commission on all of the above counts and I concur in the conclusions of the Commission that these acts violate our rules, statutes and judicial canons and that their violation renders respondent subject to disciplinary action by this court.

The fourth is a specific charge that respondent used his official stationery and his office in making a personal injury claim against the Cameron Mutual Insurance Company.

I do not agree with the Commission's view that the use of "official stationery" was the critical issue in this matter. Every person involved in this matter knew the respondent to be a judge and it mattered not whether he wrote regarding his claim on his official stationery or upon his private stationery. The real issue is whether he "used his office" or whether he was guilty of "oppression in office" by reason of his acts. The following are the controlling facts.

On March 3, 1977, respondent was rear ended resulting in $391.09 damage to his automobile. He also made a loss of use claim in the amount of $75 stating that he was obligated to his brother for use of a car while repairs were being made. The evidence is disputed as to whether respondent told the adjuster he would make no claim for personal injury. The evidence is undisputed that respondent did later claim a whiplash; that he had not seen a doctor in the seven weeks following the accident and prior to making the claim; that he wrote Cameron Mutual asserting a claim for the property damage, the loss of use and an additional $2,500 for his personal injury; that Cameron Mutual requested a medical report; and that on April 21, 1977, respondent wrote a second letter to Cameron Mutual enclosing his medical report and re-asserting his demand. The evidence is also undisputed that on April 18, 1977, three days prior to his second letter and during the course of his dealings with Cameron Mutual, respondent did dismiss a Cameron Mutual case pending in his court styled *Cameron Mut. Ins. Co. (Plaintiff) v. St. Louis & San Francisco R. R. (Defendant)*, Howell County. The case was later reinstated at the request of Cameron Mutual's attorney. The docket sheet showed there had been activity on the dismissed case within four months prior to the dismissal and a trial setting which had been passed about a month before the dismissal.

The medical report was written by Dr. Penton Wilson, a D.O., in respondent's office and in his presence, and was in the following form:

"April 21, 1977

To Whom It May Concern:

This is to certify that I have this day made physical examination of Judge Winston V. Buford of Eminence and find that as a *result* of March 3, 1977 auto accident (his car struck violently from rear by another vehicle) he is suffering with whiplash injury of the neck and will require treatment until recovery.

Sincerely,
Penton Wilson, D.O."

Dr. Wilson was under probation in respondent's court for drug violations and the State Board of Healing Arts had been seeking to open the court file which had been closed by respondent.

Insurance adjuster Baty testified that twenty days after the accident respondent told him he would make no claim for personal injury. Respondent testified he made no such statement to the adjuster. The Commission resolved this issue of credibility in favor of the adjuster Baty and against the respondent. The same Baty testified that it was his impression that respondent "meant business"; and, that such a demand without a substantiating medical report was "unusual." Respondent testified that he had no intent to convey such an impression. The Commission again resolved the credibility issue against respondent. Baty had also testified without contradiction and with reference to the claim that "liability was questionable."

The Commission inferred and concluded from these facts that respondent has exploited his office contrary to the judicial canons. I find nothing in our newly adopted standard of review which would dictate that we hold the inference and conclusion of the Commission unreasonable. On the contrary, I would submit that the facts above compel acceptance of the inference and conclusion drawn by the Commission.

Fifth, Count 8 specifically charges respondent with publicizing the Commission proceedings. Count 8 deserves but brief attention. The respondent was charged with calling his local bar together to tell them that he was under investigation. While I consider this act to be in poor taste, I consider the act to be at most a technical violation for the reason that the secrecy provisions are designed primarily for the benefit of the person being investigated. I mention the count for one reason only—to illustrate the inconsistency of respondent. While he complains of the publicity attendant to these proceedings, it was he who chose to make a public announcement to his local bar members.

Further inconsistency is illustrated by the fact that in the meeting with his bar he announced that whatever he had done in the Perkins matter, he had done it to help and protect the mother. Throughout the hearing, he contended all such acts were done to protect "the best interest of the child." Respondent's inconsistency is best illustrated in other parts of the testimony relating to the Perkins matter. In explaining why he had disqualified himself in the early days of the Perkins proceedings, respondent castigated and condemned Perkins as set forth in the Commission Findings, Count 1A. He later resorted to ex parte proceedings to try to take the custody from the mother and to place it in the castigated and condemned Mr. Perkins.

Sixth, it was charged generally that respondent's course of conduct proved that he was prejudiced for in-circuit lawyers and against out-of-circuit lawyers.

Most of the remaining charges fall into this "catch all" category. There are some three hundred pages of respondent's explanation of his intent and motives, all of which the Commission was entitled to disbelieve. We, by our newly adopted standard of review, are obligated to defer to the Commission on questions of credibility. The total findings of the Commission indicate virtual total disbelief of respondent's explanations and justifications of his acts. For my own part, I have always presumed that proper judicial conduct can stand on its own and requires neither explanation nor justification. It should speak for itself and ride or fall on its own merits.

There were approximately thirty character witnesses called by respondent, most of whom testified they did not believe he was prejudiced. About twenty witnesses were called by the Commission to prove the contrary. It would serve no good purpose and it is not necessary to the outcome of this dissenting opinion to recite all of the remainder of this voluminous testimony.

Suffice it to say, the lengthy transcript illustrates all of the misunderstandings, hard feelings and difficulties that can result from the haphazard administration of jus-

tice. It reflects a story of dilatory attorneys, late and unfiled pleadings and oral and partial agreements. Attorneys relied on opposing counsel to take up or call up their motions. Arrangements and even court orders were loose, unwritten and unconfirmed. In this background, it was not surprising to see adverse rulings and losses rationalized by attorneys as resulting from either "influence of opposing counsel" or "prejudice of the court." However, the manner in which respondent conducted court proceedings invited such haphazard practices. There were several instances in which litigants were required to seek appellate relief from respondent's abuse of their basic rights. The record is a catalog of acts that cannot do other than render suspect the administration of justice in the 37th Judicial Circuit.

Dismissal of cases without notice or upon the oral suggestion of one of the attorneys who happens to be in court, (the odds are that he is an in-circuit lawyer), can possibly lead some to infer judicial prejudice for local lawyers and against out-of-circuit lawyers. Dismissal of cases without notice, regardless of the alleged motive of "cleaning the docket," and even though such cases may be reinstated, can prove most embarrassing to lawyers as officers of the court. Such practice shatters the faith of litigants in our system of justice. We need not elaborate on the proposition that respondent is held to know that ex parte orders should be used only in the rarest instances and with the greatest of caution.

The office of circuit judge is generally regarded as the highest public office at the local level of our government. Recent judicial reform increased its duties, responsibilities and importance. If returned to his office, respondent will become the "Presiding Judge" over all of the associate judges of the four county circuit.

The elected circuit judge of rural Missouri is a powerful political and social force in the community. The power and prestige of the office carries with it a commensurate duty and obligation. That duty and obligation is to conduct the office in accordance with the very highest ethical and judicial standards. It is his duty to be the leader of the local bar and to set its legal and ethical standards. It is in the trial courtroom that the public has its direct contact with the judicial system and that the public formulates its opinion as to the fairness and the integrity of the system.

It is with consideration for these factors that we should consider and determine the form of sanctions to be applied in cases such as the one presently before us.

I respectfully dissent as to the discipline ordered in the per curiam. It is not commensurate with the breach of duties and responsibilities which has occurred. Few, if any acts can destroy public confidence in our judicial system more quickly than failure to strictly adhere to rules and canons relating to disqualification of judges; the hearing of cases and dismissal of cases without notice; judges blatantly disregarding the mandates of superior courts; judges using the power and prestige of their office for personal benefit or gain; or failure of judges to adhere to the highest of standards in dealing with the rights and lives of minors and juveniles.

For the reasons stated, I would concur in and adopt the recommendation of the Commission on Retirement, Removal and Discipline that respondent be ousted.

DONNELLY, Judge, dissenting.

Article V, § 27.3 of the Constitution of Missouri reads as follows:

"Upon recommendation by an affirmative vote of at least four members of the commission, the supreme court en banc, upon concurring with such recommendation, shall remove, suspend, or discipline any judge or magistrate of any court or any member of any judicial commission or of this commission, for the commission of a crime, or for misconduct, habitual drunkenness, willful neglect of duty, corruption in office, incompetency or any offense involving moral turpitude, or oppression in office. No action taken under this section shall be a bar to or prevent any other action authorized by law."

In my view, this constitutional language demonstrates the intention that the Commission on Retirement, Removal and Discipline be a full partner with this Court in the operation of our judicial disciplinary system. This constitutional delegation of powers by Missouri to the Commission and the Court is unique. It compels a different treatment by this Court of the recommendations of the Commission than is recognized in the judicial disciplinary systems of our sister states of California and Alaska, where there is de novo review by the Court of Commission findings and recommendations. See *Geiler v. Commission on Judicial Qualifications*, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1 (1973) and *In re Hanson*, 532 P.2d 303 (Alaska 1975).

The ultimate decision-making process under Art. V, § 27 consists of at least three functions (See *Geiler, supra*, 110 Cal.Rptr. 201, 204, 515 P.2d 1, 4):

(1) The *fact-finding* function: a determination whether the conduct alleged in the charges to have occurred did in fact occur. In the exercise of this function, the Court should adopt the findings of fact of the Commission unless there is no substantial evidence upon the whole record to support them.

(2) The *question of law* function: a determination whether certain conduct, found as a fact to have occurred, constitutes "a crime, * * * misconduct, habitual drunkenness, willful neglect of duty, corruption in office, incompetency or * * * [an] offense involving moral turpitude, or oppression in office." In the exercise of this function, the Court should show deference to the conclusions of the Commission, and adopt them unless firmly convinced they are wrong.

(3) The *imposition of discipline* function: a determination of the sanction, if any, to be imposed upon the judge. In the exercise of this function, the Court should show deference to the recommendations of the Commission, and follow them unless firmly convinced they are unjust.

I think it must be said that when the people of Missouri adopted Art. V, § 27, they intended a more significant role for the Commission than is given to it by the principal opinion.

I concurred in the principal opinion of November 14, 1978. We have reheard the case and it is now obvious that I made a mistake.

I respectfully dissent.

RENDLEN, Judge, dissenting.

I respectfully dissent. The motion for rehearing in this cause was sustained and the former opinion of the court withdrawn and has no precedential effect. The case was reargued and in that resubmission the court was ably assisted by the additional briefs and arguments of counsel. The majority in the per curiam opinion have adopted a standard for judicial disciplinary proceedings by which this Court will make "an independent review" giving "substantial consideration and due deference to the Commission's ability to judge the credibility of the witnesses appearing before it." Although such "independent review" is, in my view, more acceptable than the de novo standard originally promulgated in the now withdrawn opinion, I believe that the Commission's determination of facts should be shown greater deference than the majority would accord. I believe that reasonable factual inferences drawn by the Commission should also be given "substantial consideration and due deference" by this Court.

While I feel such deference is necessary for proper review of the Commission's findings and conclusions, I have nevertheless reviewed the record under the standard of "independent review" now prescribed by the majority and am compelled to dissent.

From this new review of the record it is apparent that the previous erroneous opinion of the Court was properly ordered withdrawn. Further, the evidence sufficiently supports the findings of the Commission so that I now concur in the Commission's conclusion that respondent's guilt of judicial misconduct rises to a level warranting removal. In this connection I concur with the dissenting portion of the opinion of Welliv-

er, J., and I would order respondent's removal from office as judge of the 37th Judicial Circuit.